FILED

01/08/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0368

DA 19-0368

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2021 MT 8

STATE OF MONTANA,

      Plaintiff and Appellee,

   v.

STEVEN WAYNE KEEFE,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. ADV 17-0076
Honorable Gregory G. Pinski, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            John R. Mills (argued), Genevie Gold, Phillips Black, Inc., Oakland,
California

            Elizabeth K. Ehret, Attorney at Law, Missoula, Montana

            Alex R. Rate, ACLU of Montana, Missoula, Montana

      For Appellee:

            Austin Knudsen, Montana Attorney General, Roy Brown (argued),
Assistant Attorney General, Helena, Montana

            Colleen E. Ambrose, Bureau Chief, Department of Corrections,
Helena, Montana

            Joshua A. Racki, Cascade County Attorney, Great Falls, Montana

      For Amici Montana Association of Criminal Defense Lawyers:

            Colin M. Stephens, Smith & Stephens, P.C., Missoula, Montana

For Amici Juvenile Law Center:

Benjamin M. Darrow, Darrow Law PLLC, Missoula, Montana

Marsha L. Levick, Juvenile Law Center, Philadelphia, Pennsylvania

Argued: September 11, 2020
Submitted: September 22, 2020
Decided: January 8, 2021

Filed:

_____

Clerk

2

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1 Defendant and Appellant Steven Wayne Keefe (Keefe) appeals the May 6, 2019 Sentence, Order to Close File, and Order Exonerating Bond issued by the Eighth Judicial District Court, Cascade County, which, in relevant part, re-sentenced him to life without parole for three counts of deliberate homicide committed when he was a juvenile.[1]

¶2 We restate the issues on appeal as follows:

1. *Whether the District Court's failure to appoint Keefe his own expert violated Keefe's right to due process.*

2. *Whether there was sufficient evidence for the District Court to conclude Keefe was irreparably corrupt and permanently incorrigible.*

3. *Whether the issue of whether Keefe was irreparably corrupt and permanently incorrigible must be presented to a jury.*

¶3 We affirm in part, reverse in part, and remand for a new sentencing hearing.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 On October 15, 1985, Keefe, then 17 years old, broke into a house near Great Falls intending to commit a burglary. Once inside, he shot and killed three people—David J. McKay, his wife Constance McKay, and their daughter Marian McKay Qamar. The next day, Keefe was arrested on charges related to previous burglaries he had committed and transferred to the Pine Hills School for Boys. While at Pine Hills, Keefe told other residents he murdered three people while burglarizing a house near Great Falls. On March 21, 1986, Keefe was charged with three counts of deliberate homicide for the murders of the McKay

---

[1] We have amended the caption of this case to "more accurately reflect the actual alignment or status" of the parties. M. R. App. P. 2(4).

family. The State amended the complaint on June 10, 1986, to add a burglary charge. Keefe was bound over from Youth Court to stand trial before the District Court as an adult. The matter went to trial in October 1986, and Keefe was ultimately convicted by the jury on all counts on October 22, 1986.

¶5 The District Court sentenced Keefe to three consecutive life terms without the possibility of parole at the Montana State Prison (MSP), with an additional ten years on each count for use of a weapon, on the deliberate homicide convictions, as well as an additional consecutive ten years, along with the ten-year enhancement for use of a weapon, on the burglary charge—a total sentence of three consecutive life terms plus 50 years. Keefe appealed his conviction to this Court in 1987, asserting the District Court erred by admitting evidence of his other crimes. We affirmed his conviction in 1988. *See State v. Keefe*, 232 Mont. 258, 759 P.2d 128 (1988).

¶6 On January 25, 2017, Keefe filed a petition for postconviction relief in the District Court, asserting his 1986 sentence of life without the possibility of parole was unconstitutional in light of the United States Supreme Court's decisions in *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455 (2012) and *Montgomery v. Louisiana*, 577 U.S. ___, 136 S. Ct. 718 (2016). The Supreme Court's decisions in *Miller* and *Montgomery* collectively held that mandatory sentences of life without parole for juvenile offenders were unconstitutional "for all but the rarest of children, those whose crimes reflect 'irreparable corruption.'" *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 726 (quoting *Miller*, 567 U.S. at 479-80, 132 S. Ct. at 2469). *Montgomery* held that *Miller* was to be applied retroactively because *Miller* "announced a substantive rule of constitutional law,"

4

*Montgomery*, 577 U.S. at \_\_\_, 136 S. Ct. at 734, and those juveniles already sentenced to life without parole "must be given the opportunity to show their crime did not reflect irreparable corruption; and, if it did not, their hope for some years of life outside prison walls must be restored." *Montgomery*, 577 U.S. at \_\_\_, 136 S. Ct. at 736-37. Proceedings before the District Court in the present case were stayed while this Court considered, and ultimately decided, *Steilman v. Michael*, 2017 MT 310, 389 Mont. 512, 407 P.3d 313. In *Steilman*, we held that the mandates of *Miller* and *Montgomery* "apply to discretionary sentences in Montana." *Steilman*, ¶ 3.

¶7      After this Court decided *Steilman*, the District Court lifted its stay on proceedings and issued its Memorandum and Order Re: Petition for Postconviction Relief, which determined Keefe must be resentenced in light of *Miller*, *Montgomery*, and *Steilman* because the original sentencing hearing did not consider Keefe's youth, background, mental health, or substance abuse. Keefe filed several motions before resentencing.[2] Relevant to the present proceeding, Keefe sought state funds for an expert and mitigation

---

[2] The motions included: Motion to Proceed Ex Parte and Under Seal to Seek State Funds for Expert and Mitigation Services; Motion for Jury Sentencing and Requiring a Finding Beyond a Reasonable Doubt; Motion for Sentence Eligibility Finding Pursuant to *Miller* and *Montgomery*; Motion to Exclude the Heinous or Senseless Aspects of the Crime to Support a Finding of Irreparable Corruption; Motion to Apply Presumptive Sentencing; Motion to Strike Juveniles' Eligibility for Life Without the Possibility of Parole in Light [of] MT's Statute's Failure to Limit the Pool of Offenders Eligible for that Sentence; Motion to Categorically Exempt Juveniles from Life Without the Possibility of Parole; Motion in Limine to Apply the Confrontation Clause, Limit Prior Testimony, and to Exclude Evidence of Prior Bad Acts; and Renewed Ex Parte and Sealed Motion for State Funds for Expert and Mitigation Services. While the District Court allowed Keefe to proceed under seal and seek state funds for expert and mitigation services, the District Court uniformly denied Keefe's other motions in its January 15, 2019 Consolidated Order Denying [Defendant]'s Motions.

5

services and sought a jury determination of whether he was "irreparably corrupt" beyond a reasonable doubt pursuant to *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000). On December 13, 2018, the District Court issued its Consolidated Order Re: Expert Testimony and Fees, which ordered the probation and parole office to perform an updated presentence investigation and appointed Dr. Robert Page as an independent expert to prepare a mental evaluation of Keefe as it determined the mental health information from Keefe's original sentencing was "outdated in light of the intervening decades' advances in the fields of psychology and neuroscience." The District Court's order directed Dr. Page to consider, at a minimum:

1) The brain development of juveniles as a mitigating factor;

2) The effect of Keefe's developmental experiences on his commission of the crime;

3) An examination of Keefe's mental health prior to and contemporaneously with his commission of the crime;

4) An examination of Keefe's chemical dependency history prior to and contemporaneously with his commission of the crime; and

5) Any treatment recommendations related to Keefe's rehabilitation.

The District Court denied Keefe's motion for state funds to procure his own expert and his motion for a jury to determine whether he was "irreparably corrupt" in its January 15, 2019 Consolidated Order Denying [Defendant]'s Motions.

¶8 The District Court held a resentencing hearing on April 18, 2019. At the hearing, former Cascade County Sheriff's Deputy James Bruckner, Montana Department of Justice Department of Criminal Investigation Agent John Sullivan, Probation and Parole Officer

6

Tim Hides, Dr. Page, former MSP supervisor Robert Shaw, and former MSP Warden James Mahoney testified. At the conclusion of the hearing, the District Court orally resentenced Keefe to three consecutive life terms at MSP, along with an additional consecutive 50 years for the burglary and weapons enhancements, without the possibility of parole. The District Court's written Sentence, Order to Close File, and Order Exonerating Bond followed on May 6, 2019. On June 7, 2019, Keefe filed a Motion for Reconsideration Before a New Judge, which the District Court denied with a written order on June 11, 2019. Keefe appeals. Additional facts will be discussed as necessary below.

## STANDARD OF REVIEW

¶9 Motions requesting an examination by a psychiatrist where the existence of a mental disease or defect is not at issue fall within the discretion of the trial court, and we review those decisions for an abuse of discretion. *State v. Hill*, 2000 MT 308, ¶ 21, 302 Mont. 415, 14 P.3d 1237 (citations omitted). An abuse of discretion occurs when a court acts arbitrarily or unreasonably, resulting in substantial injustice. *State v. Grimshaw*, 2020 MT 201, ¶ 17, 401 Mont. 27, 469 P.3d 702 (citing *State v. Holland*, 2019 MT 128, ¶ 8, 396 Mont. 94, 443 P.3d 519).

¶10 This Court reviews criminal sentences for legality. *State v. Yang*, 2019 MT 266, ¶ 8, 397 Mont. 486, 452 P.3d 897 (citing *State v. Coleman*, 2018 MT 290, ¶ 4, 393 Mont. 375, 431 P.3d 26). We review a claim that a sentence violates the constitution de novo. *State v. Tam Thanh Le*, 2017 MT 82, ¶ 7, 387 Mont. 224, 392 P.3d 607 (citation omitted). "We review the district court's findings of fact on which its sentence is based to determine whether they are clearly erroneous." *State v. Hamilton*, 2018 MT 253, ¶ 14, 393 Mont.

102, 428 P.3d 849 (citing *State v. Shults*, 2006 MT 100, ¶ 34, 332 Mont. 130, 136 P.3d 507).

¶11 We review de novo whether a district court violated a defendant's constitutional rights at sentencing. *State v. Haldane*, 2013 MT 32, ¶ 17, 368 Mont. 396, 300 P.3d 657 (citations omitted).

## DISCUSSION

¶12 This case involves the resentencing of Keefe for a triple homicide he committed while a juvenile. For these murders, Keefe was sentenced to three consecutive life terms without the possibility of parole. Keefe served approximately 30 years on his sentences before filing his 2017 petition for postconviction relief. During the intervening years, the U.S. Supreme Court issued several decisions which recognized the inherent differences which must be considered by a court when sentencing a juvenile. In accordance with those principles, the Supreme Court (1) banned the death penalty for juveniles in *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183 (2005); (2) banned life without parole for juvenile offenders who committed a nonhomicide crime in *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011 (2010); (3) banned mandatory life without parole sentences for juveniles in *Miller*; and (4) determined the substantive protections of *Miller* must be applied retroactively in *Montgomery*.

¶13 The collective thrust of Supreme Court jurisprudence on this issue over the last several years is a recognition that juveniles are "constitutionally different from adults in their level of culpability," and those differences must be considered by a sentencing court. *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 736. Due to those differences, even juveniles

8

who commit heinous crimes, such as Keefe, cannot be sentenced to life without parole unless they are "irreparably corrupt" and "permanently incorrigible" as such a punishment would violate the Eighth Amendment's ban on "cruel and unusual punishments." U.S. Const., Amend. VIII; *see also* Mont. Const. art. II, § 22 ("Excessive bail shall not be required, or excessive fines imposed, or cruel and unusual punishments inflicted."). With these heady constitutional principles in mind, we turn now to Keefe's appeal of the District Court's order which resentenced him to life without parole for the three homicides he committed while a juvenile.

¶14 *1. Whether the District Court's failure to appoint Keefe his own expert violated Keefe's right to due process.*

¶15 Keefe was initially represented in his petition for postconviction relief, pro bono, by private counsel. He then entered into an agreement with the Office of Public Defender (OPD), whereby OPD would represent him, with his original counsel continuing as contract counsel for OPD. Keefe sought state funds to hire a mitigation expert, a forensic psychiatrist, an adaptive functioning expert, a substance abuse expert, and a psychologist. The District Court, who had already appointed Dr. Page as an independent expert to examine Keefe, denied Keefe's motion. Dr. Page assessed Keefe, produced a written report, and testified at the resentencing hearing.

¶16 Keefe appeals, asserting he had a constitutional right to the appointment of such experts to aid his defense pursuant to the Supreme Court's decision in *Ake v. Oklahoma*, 470 U.S. 68, 105 S. Ct. 1087 (1985). The State argues *Ake* is inapplicable to Keefe's resentencing proceeding because Keefe does not have a constitutional right to a psychiatrist

9

to aid in his defense when his sanity is not at issue.  We agree with the State on this issue and conclude *Ake* is not implicated by the resentencing proceeding here.

¶17    In *Ake*, the Supreme Court held

> that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.  This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own.  Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the States the decision on how to implement this right.

*Ake*, 470 U.S. at 83, 105 S. Ct. at 1096.  This Court has previously recognized that "[t]he Supreme Court's holding in *Ake* applies only upon a preliminary showing that the defendant's sanity will be an issue at trial." *Hill*, ¶ 25 (citing *Ake*, 470 U.S. at 74, 105 S. Ct. at 1091-92).  The Supreme Court has further clarified when Ake is applicable: (1) the defendant must be indigent; (2) the defendant's mental condition must be relevant to the punishment he might suffer; and (3) the defendant's sanity at the time of the offense must be in question.  *McWilliams v. Dunn*, 582 U.S. ___, ___, 137 S. Ct. 1790, 1798 (2017) (citations omitted).  If *Ake*'s threshold criteria are met, "a State must provide a mental health professional capable of performing a certain role: 'conduct[ing] an appropriate examination and assist[ing] in evaluation, preparation, and presentation of the defense.'" *McWilliams*, 582 U.S. at ___, 137 S. Ct. at 1794 (quoting *Ake*, 470 U.S. at 83, 105 S. Ct. at 1096).

¶18    In this case, the threshold criteria of *Ake* are not met, and therefore Keefe was not entitled to his own team of experts to assist in his defense before resentencing. While Keefe was indigent, and his youthful mental condition was relevant to determining whether he was "irreparably corrupt" and "permanently incorrigible," Keefe's sanity has never been at issue—either at Keefe's original trial and sentencing or at resentencing. In addition, the District Court appointed Dr. Page to examine Keefe as an independent, neutral expert and the Supreme Court has declined to answer whether "a State must provide an indigent defendant with a qualified mental health expert retained specifically for the defense team, not a neutral expert available to both parties." *McWilliams*, 582 U.S. at ___, 137 S. Ct. at 1799.

¶19    Dr. Page conducted an independent and neutral examination of Keefe prior to the resentencing hearing. Dr. Page also testified at the resentencing hearing, where he was questioned by the District Court as well as counsel for both the State and Keefe. Dr. Page, though he declined to determine whether Keefe was in fact "rehabilitated," testified favorably to Keefe in several regards. He noted Keefe's turbulent upbringing and juvenile rebelliousness, but noted—after Keefe's initial struggles and continued lawlessness in his first years in prison—that Keefe "has matured through the process of his incarceration" and acquired an effective work ethic; has not displayed proneness toward aggression or violence; completed beneficial therapeutic programs; and shows respect for authority and follows the rules. Dr. Page concluded Keefe had "a relatively low risk to commit future acts of violence" as long as Keefe remained supervised and recommended a gradual reintroduction to society if he was granted parole. Overall, Dr. Page's testimony was

11

favorable to Keefe as he found Keefe had a low risk to reoffend and could be reintegrated into society if granted parole.

¶20 Keefe's right to due process was not violated by the District Court appointing Dr. Page as a neutral expert to examine him, because *Ake* is not applicable to the present case. Dr. Page's independent examination satisfied due process requirements, and the State was not required to provide Keefe with a team of experts to assist with his defense at resentencing.

¶21 *2. Whether there was sufficient evidence for the District Court to conclude Keefe was irreparably corrupt and permanently incorrigible.*

¶22 "The *Miller* Court outlined five factors of mandatory sentencing schemes that prevent the sentencer from considering youth and from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender." *Steilman*, ¶ 16 (citation and internal quotation marks omitted).

> Mandatory life without parole for a juvenile [1] precludes consideration of his chronological age and its hallmark features--among them, immaturity, impetuosity, and failure to appreciate risks and consequences. [2] It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. [3] It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. [4] Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. And [5] finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.

*Miller*, 567 U.S. at 477-78, 132 S. Ct. at 2468 (internal citations and quotations omitted).

In *Steilman*, we held that "*Miller*'s substantive rule requires Montana's sentencing judges

12

to adequately consider the mitigating characteristics of youth set forth in the *Miller* factors when sentencing juvenile offenders to life without the possibility of parole[.]" *Steilman*, ¶ 17.

¶23    *Miller* did not categorically bar life without parole as a punishment for juvenile offenders.  "*Miller* did bar life without parole, however, for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility."  *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734.  "Because juveniles have diminished culpability and greater prospects for reform," the Supreme Court has explained, "'they are less deserving of the most severe punishments.'"  *Miller*, 567 U.S. at 471, 132 S. Ct. at 2464 (quoting *Graham*, 560 U.S. at 68, 130 S. Ct. at 2026).  As *Montgomery* noted, the *Miller* Court explained three significant gaps between juveniles and adults:

> First, children have a "lack of maturity and an underdeveloped sense of responsibility," leading to recklessness, impulsivity, and heedless risk-taking. Second, children "are more vulnerable to negative influences and outside pressures," including from their family and peers; they have limited "control over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings.  And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievable depravity."

*Montgomery*, 577 U.S. at ___, 136 S. Ct. at 733 (quoting *Miller*, 567 U.S. at 471, 132 S. Ct. at 2464).

¶24    At the resentencing hearing, and in its written Sentence, Order to Close File, and Order Exonerating Bond, the District Court noted that it believed it was "improper" to consider whether Keefe had rehabilitated in prison and that there was "no legal support" for the notion that a juvenile offender, such as Keefe, who was being resentenced after

13

originally being sentenced to life without parole could have his post-offense conduct considered at sentencing.[3] The District Court therefore disregarded the substantial evidence of Keefe's rehabilitation in the 30-plus years since the homicides. Because of this disregard for evidence of rehabilitation, Keefe's resentencing hearing did not comply with the mandates of *Miller* and *Montgomery* by concluding Keefe was "irreparably corrupt" and "permanently incorrigible" without fully considering relevant evidence.

¶25 The State argues the District Court did adequately consider the *Miller* factors at resentencing, but we are not persuaded by this argument in light of the District Court's explicitly stated conclusion that it would not consider evidence of Keefe's post-offense rehabilitation. If a district court fails to adequately consider any of the *Miller* factors, a remand for resentencing is appropriate. In this case, to conclude the District Court erred, we need only consider the fifth *Miller* factor: "the possibility of rehabilitation even when the circumstances most suggest it." *Miller*, 567 U.S. at 478, 132 S. Ct. at 2468.

¶26 As a preliminary matter, we note the appearance of impropriety created by the District Court setting a four-hour sentencing hearing, and then, at the start of that hearing, notifying the parties they only had three hours to present their cases because the District Court would need an hour to read its findings and ruling. While this is not conclusive

---

[3] While the District Court allowed Keefe to present evidence regarding his post-offense rehabilitation in prison at the resentencing hearing, it specifically declined to consider the positive evidence of rehabilitation presented. As discussed below, the District Court did consider evidence of negative behaviors by Keefe after he committed the homicides. Justice McKinnon's Dissent similarly considers the evidence of negative post-offense conduct as relevant to the possibility of rehabilitation, but disclaims the relevance of the undisputed evidence of Keefe's rehabilitation in the years since the offenses. Dissent, ¶ 63. All post-offense conduct—good and bad—should be considered when resentencing for an offense committed as a juvenile. Such did not occur here.

14

evidence the District Court had pre-judged the matter, at a minimum it gives the appearance of impropriety and should be avoided.

¶27    At the resentencing hearing, and in his report, Dr. Page testified extensively about Keefe's prospects of rehabilitation.   As noted above, while Dr. Page declined to conclusively determine whether Keefe had been, or could be, "rehabilitated" as a philosophical matter, he did testify to Keefe's maturation over his lengthy period of incarceration.   Dr. Page concluded that "[e]mpirically measured differences between Keefe's psychological profile at the age of 17 and his current profile at the age of 51, along with research in the area of neuropsychological development and maturation are consistent in suggesting that he has responded to efforts at rehabilitation over a 33 year period of incarceration."   Dr. Page found Keefe could succeed outside of prison and was a different person now than he was when he committed the triple homicide in 1985.  The *Miller* and *Montgomery* holdings, in essence, establish a presumption against life without parole sentences for juveniles unless they are "irreparably corrupt" or "permanently incorrigible." Here, the District Court concluded Keefe to be "irreparably corrupt" and "permanently incorrigible" without considering the unrebutted evidence of Dr. Page and former MSP supervisor Shaw and Warden Mahoney that Keefe has in fact matured and made progress towards rehabilitation and that he could be successful outside of prison.

¶28    The State argues that the District Court did not have to consider post-offense evidence of rehabilitation, and that, even if it did, Keefe has not shown rehabilitation.[4]   The

---

[4] The Dissent appears to agree with the State on this point, claiming—in spite of the District Court's statements it would not consider post-offense evidence of rehabilitation—that the District

District Court, and the State, both clearly agreed that it was proper to consider Keefe's post-offense behavior when that behavior was negative, such as his early history of disciplinary infractions at the prison. The State, and the District Court, repeatedly made mention of, and gave weight to, tattoos Keefe has gotten while incarcerated as evidence of a lack of remorse. On the whole, the District Court clearly considered post-offense evidence when resentencing Keefe. It simply chose to disregard the rehabilitation evidence presented.[5]

¶29    While not binding on this Court, we find the Ninth Circuit's decision in *United States v. Briones*, 929 F.3d 1057 (9th Cir. 2019) (en banc), instructive on the issue of whether it is proper for a court resentencing a juvenile serving a sentence of life without parole to consider post-offense rehabilitation. In *Briones*, the Ninth Circuit stated:

> The eighteen years that passed between the original sentencing hearing and the resentencing hearing provide a compelling reason to credit the sincerity of Briones's efforts to rehabilitate himself. Briones was sentenced in 1997; *Miller* was not issued until 2012. Thus, for the first fifteen years of Briones's incarceration, his [life without parole] sentence left no hope that he would ever be released, so the only plausible motivation for his spotless prison

Court "considered the prospects of rehabilitation at the time of Keefe's original sentencing and at his resentencing[.]" Dissent, ¶ 65. Under the logic presented by the Dissent, Keefe's resentencing hearing was all for show, particularly when the District Court specifically declined to consider the undisputed post-offense rehabilitation evidence presented. This imbalance is clearly constitutionally impermissible as only those youthful offenders who are "irreparably corrupt" and "permanently incorrigible" may be sentenced to life without parole. Retroactively labeling an offender who has rehabilitated to be "irreparably corrupt" and "permanently incorrigible" based on the severity of his crimes while ignoring those labels are inaccurate violates the protections of *Miller* and *Montgomery*.

[5] The Dissent, in finding the District Court did consider Keefe's post-offense rehabilitation evidence, appears to confuse the undisputed fact the District Court *heard* the evidence with the undisputed fact the District Court specifically stated it refused to *consider* that evidence and was under no legal authority to do so.

16

record was improvement for improvement's sake. This is precisely the sort of evidence of capacity for change that is key to determining whether a defendant is *permanently* incorrigible, yet the record does not show that the district court considered it. This alone requires remand.

*Briones*, 929 F.3d at 1066-67 (emphasis in original). Here, Keefe was sentenced in 1986—26 years before *Miller* was decided. It is undisputed that Keefe struggled and continued to act out in his early years at the prison, but had begun to mature and rehabilitate approximately two decades before the Supreme Court issued *Miller*. Though the State and the District Court insinuated Keefe's lack of trouble at the prison over the last several years was solely due to the advice of counsel and hope for release provided by *Miller*, such an insinuation is unfounded based upon our review of the record. Keefe's last infractions came years before both *Miller* was decided and years before he ever met his counsel. At the time Keefe began making efforts to rehabilitate himself and stopped committing infractions at the prison, he had no hope of being released and was only making improvement for improvement's sake. Dr. Page testified to his improvement over the years, and so did two MSP employees who knew Keefe for years—former MSP supervisor Shaw and former MSP Warden Mahoney. "This is precisely the sort of evidence of capacity for change that is key to determining whether a defendant is *permanently* incorrigible[.]" *Briones*, 929 F.3d at 1067 (emphasis in original). Unlike *Briones*, where the record showed the district court failed to consider post-offense rehabilitation evidence, the record here shows the District Court explicitly refused to consider such evidence.

¶30 "If subsequent events effectively show that the defendant *has* changed or *is* capable of changing, [a sentence of life without the possibility of parole] is not an option." *Briones*,

17

929 F.3d at 1067 (emphasis in original). We agree with the *Briones* court that post-offense evidence of rehabilitation is clearly required to be considered by a court resentencing a juvenile who is serving a sentence of life without parole. Because *Miller* commands a resentencing court to consider "the possibility of rehabilitation" before a juvenile can lawfully be sentenced to life without parole, evidence of rehabilitation in the years since the original crime must be considered by the resentencing court. This is consistent with the sentencing policy of Montana which does not merely provide for punishment, protection of the public, and restitution, but also for rehabilitation and reintegration of offenders back into the community:

> The correctional and sentencing policy of the state of Montana is to:
>
> (a) punish each offender commensurate with the nature and degree of harm caused by the offense and to hold an offender accountable;
>
> (b) protect the public, reduce crime, and increase the public sense of safety by incarcerating violent offenders and serious repeat offenders;
>
> (c) provide restitution, reparation, and restoration to the victim of the offense; *and*
>
> (d) *encourage and provide opportunities for the offender's self-improvement to provide rehabilitation and reintegration of offenders back into the community.*

Section 46-18-101(2), MCA (emphasis added). Sentencing practices must permit judicial discretion to consider aggravating and mitigating circumstances including any "fact that exists in mitigation of the penalty." Section 46-18-304(2), MCA.[6] At the time of

---

[6] While this statute specifically refers to the death penalty, the Supreme Court in *Miller* "imported the Eighth Amendment requirement 'demanding individualized sentencing when imposing the death penalty' into the juvenile conviction context, holding that 'a similar rule should apply when

18

sentencing or resentencing, the court applies the sentencing policy considering all of the aggravating and mitigating circumstances existing at the time of sentencing. The sentencing court must take into account aggravating circumstances—such as the nature and severity of the offenses here—and mitigating circumstances—including all of the *Miller* factors which include rehabilitation success shown to have occurred by the time of sentencing. Section 46-18-101(3)(d); *see also Miller*, 567 U.S. at 489, 132 S. Ct. at 2475 (holding a sentencing judge "must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles"). In this case, that did not happen and the District Court did not "adequately consider the mitigating characteristics of youth set forth in the *Miller* factors[.]" *Steilman*, ¶ 17. By refusing to consider post-offense evidence of rehabilitation, the District Court violated Keefe's constitutional rights at the resentencing hearing. Accordingly, Keefe is entitled to a new resentencing hearing which appropriately considers the *Miller* factors.[7]

¶31    We note here the trauma the McKay family has endured as a result of Keefe's offenses and are mindful the reopening of this case 34 years later has been emotionally difficult. We sincerely wish the District Court had avoided the path it took and had rather

---

a juvenile confronts a sentence of life (and death) in prison.'" *Campbell v. Ohio*, ___ U.S. ___, 138 S. Ct. 1059, 1060 (2018) (Sotomayor, J., respecting the denial of certiorari) (quoting *Miller*, 567 U.S. at 475, 477, 132 S. Ct. at 2467, 2468).

[7] While the Chief Justice's Concurrence and Dissent raises additional important constitutional issues involving the interplay of Article II, Section 15, and Article II, Section 22, of the Montana Constitution, such are not squarely before us. The constitutionality issues as raised and analyzed in the Chief Justice's Concurrence and Dissent were not presented and addressed at the district court level. On remand, the parties are free to raise these issues before the District Court where it can squarely address them.

19

fairly and objectively considered the *Miller* factors including the uncontested evidence of Keefe's rehabilitation progress. While we do not take this decision lightly, we are bound to uphold the constitutional rights of juvenile defendants—even those who commit the most severe offenses. Because the 2019 resentencing hearing did not do so, it must be vacated and remanded for resentencing in accordance with this opinion.

¶32    *3. Whether the issue of whether Keefe was irreparably corrupt and permanently incorrigible must be presented to a jury.*

¶33    Although we have determined the District Court erred in determining Keefe was "irreparably corrupt" and "permanently incorrigible" and are reversing his sentence on that basis, we must address whether the issue of the irreparable corruption of a minor is a fact which must be found by a jury. Keefe has argued, pursuant to *Apprendi*, that he is constitutionally entitled to have a jury determine whether he is, in fact, "irreparably corrupt" before a possible life without parole sentence. We disagree.

¶34    "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 120 S. Ct. at 2362-63. In *Steilman*, we "conclude[d] that *Miller*'s substantive rule requires Montana's *sentencing judges* to adequately consider the mitigating characteristics of youth set forth in the *Miller* factors when sentencing juvenile offenders to life without the possibility of parole[.]" *Steilman*, ¶ 17 (emphasis added).

¶35    As noted above, the Supreme Court has not categorically barred the punishment of life without parole for juvenile offenders, but "did bar life without parole, however, for all

20

but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734. Here, neither "irreparable corruption" nor "permanent incorrigibility" are facts which could increase a possible sentence. Rather, youth is a mitigating factor which can reduce the possible sentence for deliberate homicide in Montana. In accordance with *Miller* and *Steilman*, a jury is not required to determine irreparable corruption and permanent incorrigibility—that determination is properly left to the resentencing judge.

## CONCLUSION

¶36 The District Court did not err when it appointed a neutral expert for the resentencing hearing or when it denied Keefe's request for a jury to determine whether he was "irreparably corrupt" and "permanently incorrigible." The District Court did err, however, when it found Keefe to be "irreparably corrupt" and "permanently incorrigible" after the sentencing hearing as it failed to consider *Miller* factors including undisputed evidence of rehabilitation progress. Keefe is therefore entitled to a new resentencing hearing.

¶37 Affirmed in part, reversed in part, and remanded for a new resentencing hearing.

/S/ INGRID GUSTAFSON

We concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER

Chief Justice Mike McGrath, concurring and dissenting.

¶38 I concur with the majority Opinion insofar as it reverses the District Court's resentencing. However, I dissent to the majority's decision to remand to the District Court for yet another sentencing. Moreover, in my view, the Montana Constitution and the rationales underlying the *Miller* and *Montgomery* decisions warrant stronger protection for youthful defendants facing a lifetime in prison.

¶39 Growing understanding of the psychology and brain development of young people has led the United States Supreme Court to acknowledge that the biological effects of youth include a "lack of maturity and an underdeveloped sense of responsibility" and demand special constitutional protections in criminal sentencing. *See Roper v. Simmons*, 543 U.S. 551, 569, 125 S. Ct. 1183, 1195 (2005) (quotation omitted) (holding death penalty for juvenile offenders unconstitutional); *Graham v. Florida*, 560 U.S. 48, 68, 130 S. Ct. 2011, 2026 (2010) (holding life without parole sentences for juvenile offenders in nonhomicide cases unconstitutional). The Court has built on these holdings to recognize that juveniles are "constitutionally different from adults for purposes of sentencing," *Miller v. Alabama*, 567 U.S. 460, 471, 132 S. Ct. 2455, 2464 (2012), as they bear "diminished culpability and greater prospects for reform." *Montgomery v. Louisiana*, 136 S. Ct. 718, 733 (2016) (quotation omitted). These considerations "diminish the penological justifications for imposing" a mandatory life without parole sentence, rendering such sentences disproportionate under the Eighth Amendment's ban on cruel and unusual punishment. *Miller*, 567 U.S. at 472-73, 132 S. Ct. at 2465-66. According to the United States Supreme Court, life without parole for homicide crimes committed by juveniles can be imposed only

22

in "exceptional circumstances" upon the rare juvenile whose crime reflects "permanent incorrigibility" or "irreparable corruption." *Montgomery*, 136 S. Ct. at 734, 736 (citing *Miller*, 567 U.S. at 479-80, 132 S. Ct. at 2469).

¶40 The *Miller* and *Montgomery* holdings, in my view, are properly interpreted as establishing a presumption against life without parole sentences for juveniles that can be overcome only by a finding, supported by competent evidence, that the juvenile is "entirely unable to change" with "no possibility" of rehabilitation. *See Commonwealth v. Batts*, 163 A.3d 410, 435, 452 (Pa. 2017) (citing *Montgomery*, 136 S. Ct. at 733); *see generally* Alice Reichman Hoesterey, *Juvenile (In)Justice: Confusion in* Montgomery's *Wake: State Responses, the Mandates of* Montgomery*, and why a Complete Categorical Ban on Life without Parole for Juveniles Is the Only Constitutional Option*, 45 Fordham Urb. L.J. 149, 175-77 (2017). The *Montgomery* Court repeatedly admonished that life without parole must be a "rare" sentence for juvenile offenders, unconstitutional in the "vast majority" of juvenile homicide cases and justifiable only in "exceptional circumstances." *Montgomery*, 136 S. Ct. at 726, 733-34, 736. *Miller* and *Montgomery's* central reasoning is that the lack of maturity and impulse control that are characteristic of youth render such offenders both less culpable and less fixed than fully matured adults. *Miller*, 567 U.S. at 471-72, 132 S. Ct. at 2464-65 (elaborating how juvenile and adult minds are fundamentally distinct, in particular in the "'parts of the brain involved in behavior control'" (quoting *Graham*, 560 U.S. at 68, 130 S. Ct. at 2026)); *Montgomery*, 136 S. Ct. at 733. These conclusions essentially establish an empirical presumption against life without parole sentences for juvenile offenders.

23

¶41    Furthermore, the *Miller* Court noted that identifying the rare permanently incorrigible youth can only be done with "great difficulty" and that youthful defendants are already at a disadvantage when attempting to navigate the criminal justice system. *Miller*, 567 U.S. at 477-79, 132 S. Ct. at 2468-69 (citations omitted). The upshot of this reasoning is that the constitutional protections put forth in *Miller* and *Montgomery* cannot allow vulnerable young defendants facing a lifetime in prison to be saddled with the burden of establishing the nearly unprovable, but very likely correct, proposition that they are not among the exceedingly rare number of youths who are truly permanently incorrigible.

¶42    Here, the State did not overcome what in essence is the presumption against a life without parole sentence for a juvenile offender with evidence proving that Keefe was among the exceptionally few irreparably corrupt youthful offenders. To the contrary, unrebutted evidence showed that Keefe was quite capable of rehabilitation. Dr. Page's evaluation and testimony demonstrated that Keefe had matured during incarceration from an uncompassionate youth exhibiting "characteristic carelessness and antisocial acts" to a 51-year-old with an "effective work ethic" and no "demonstrated proneness towards aggression or violence." Dr. Page concluded that Keefe now had a relatively low risk to commit future acts of violence and could be reintegrated into society if granted parole.

¶43    Furthermore, the Montana Constitution's explicit protections for juveniles should compel this Court to go further and conclude that all life without parole sentences are per se unconstitutional for juvenile offenders. In *Graham*, the United States Supreme Court held that life without parole sentences for juvenile offenders are per se unconstitutional for nonhomicide cases. *Graham*, 560 U.S. 48, 130 S. Ct. 2011. It considered, but rejected, a

24

case-by-case approach like the one the majority here directs the District Court to undertake. *See Graham*, 560 U.S. at 78, 130 S. Ct. at 2032. The *Graham* Court found that predictions of juvenile development were too error prone, that sentencing courts faced with brutal crimes would give insufficient weight to the mitigating factors of youth, that youthful offenders are inherently less culpable and more disadvantaged in criminal proceedings than adults, and that, ultimately, the only reliable way to discover whether a juvenile has the potential to reform is to afford the individual the opportunity to demonstrate as much. *Graham*, 560 U.S. at 77-79, 130 S. Ct. at 2032-33. This reasoning is equally applicable to homicide crimes, as Keefe's case demonstrates and as the *Miller* Court went on to acknowledge. *Miller*, 567 U.S. at 473, 132 S. Ct. at 2465 ("[While] *Graham's* flat ban on life without parole applied only to nonhomicide crimes . . . . none of what it said about children . . . is crime-specific."); *see generally* Hoesterey, *supra*, at 185-88. While the United States Supreme Court declined to consider whether the United States Constitution required extending the per se ban on juvenile life without parole sentences to homicide cases, *Miller*, 567 U.S. at 479, 132 S. Ct. at 2469, the heightened protections for juveniles found in the Montana Constitution should compel this Court to adopt the reasoning laid out in *Graham* here.

¶44 The federal Bill of Rights is by and large a restraint on governmental power, forbidding the federal government from, for example, establishing a religion, conducting unreasonable searches and seizures, or taking private property without just compensation. *See* U.S. Const. amends. I, IV, V. In contrast, Article II of the Montana Constitution contains a Declaration of Rights *provided to individuals*. Relevant here, Article II, Section

25

22, of the Montana Constitution protects all Montana citizens from cruel and unusual punishments while Article II, Section 15, of the Montana Constitution specifically grants all fundamental rights enjoyed by adults to persons under age eighteen, but, moreover, encourages laws which enlarge the protections of youth.

¶45　As noted above, the United States Supreme Court has already found that a sentence of life without parole for juveniles implicates the proportionality element of the prohibition on cruel and unusual punishments. In the Montana charter, the right of youthful offenders to be free of such punishments is magnified by the special constitutional consideration afforded to juveniles.

¶46　Article II, Section 15, of the Montana Constitution provides:

> Rights of persons not adults. The rights of persons under 18 years of age shall include, but not be limited to, all the fundamental rights of this Article unless specifically precluded by laws which enhance the protection of such persons.

¶47　During the 1972 Constitutional Convention debate, the discussion of Section 15 clearly emphasized the importance of protecting juveniles under the new Constitution. Delegate Monroe, the committee chair and sponsor of the provision, stated

> What this section is attempting to do is to help young people to reach their full potential. Where juveniles have rights at this time, we certainly want to make sure that those rights and privileges are retained; and whatever rights and privileges might be given to them in the future, we also want to protect them.

Montana Constitutional Convention, Verbatim Transcript, March 8, 1972, Vol. V, p. 1750.

¶48　Delegate Monroe went on: "It seems to me that Montana can be the leader among all the states in recognizing the rights of people under the age of majority." Montana

Constitutional Convention, Verbatim Transcript, March 8, 1972, Vol. V, p. 1750. The provision was adopted with overwhelming delegate support. Montana Constitutional Convention, Verbatim Transcript, March 8, 1972, Vol. V, pp. 1752-53.

¶49 Delegate Monroe also noted that Section 15 provided that, "[i]n such cases where the protection of the special status of minors demands it, exceptions can be made on clear showing that such protection is being enhanced." Montana Constitutional Convention, Verbatim Transcript, March 8, 1972, Vol. V, p. 1750. Imposition of a punishment that denies an individual any hope of life outside prison walls is a case where the special status of minors demands the enhancement of their protection.

¶50 These constitutional principles warn against condemning a youth to spend a lifetime behind bars based on nothing more than a sentencing court's apparent ability to divine the young individual's supposed "irreparable" or permanently "incorrigible" nature. Predicting the development of a teenager and the prognosis for rehabilitation, as suggested by *Montgomery* and *Miller*, is a tall order, if not an impossible task.[1] Asking a court, based on professional opinion, to determine whether a teenager is irreparably corrupt or permanently incorrigible seems more like the quest for the Holy Grail than a scientifically-based inquiry. Or, given the severe consequences at hand, perhaps medieval methods for determining whether a defendant is a witch are more appropriate analogies to the nature of such an inquiry.

---

[1] These terms are no more useful to a prognosticator than the mostly abandoned term: a child "with a malignant heart."

¶51    The District Court's erroneous attempt to resentence 51-year-old Keefe by reaching back in time to forecast 17-year-old Keefe's prospects for rehabilitation from the time of the offense, all the while ignoring actual indicators of success in subsequent decades, aptly demonstrates the futility of engaging in such prognosticating in the first place. The evidence presented at the resentencing demonstrated that the violent, anti-social traits of 17-year-old Keefe had little to no bearing on the character traits of the fully-matured Keefe several decades later. At the time of the offense, an observer may have reasonably thought Keefe to be beyond hope of rehabilitation, a conclusion apparently adopted by the District Court at resentencing.

¶52    However, evidence presented at Keefe's resentencing revealed that such an observer would have been proven wrong in the intervening decades. This dissonance aptly demonstrates that predicting an adolescent's potential for rehabilitation is risky business. The District Court's exercise was analogous to standing among drought-parched crops while ruefully reviewing a Farmer's Almanac predicting a wet growing season. Important constitutional interests of this nature cannot be subject to the outcomes of such doubtful prophesying.

¶53    Even if judicial predictions of teenage incorrigibility were not so dubious, life without parole would still be an inappropriate sentence for a youthful offender. The *Miller* decision acknowledged that the defining characteristics of youthfulness, in and of themselves, "diminish the penological justifications for imposing" a life without parole sentence. *Miller*, 567 U.S. at 472-73, 132 S. Ct. at 2465. In essence, juvenile status itself, regardless of the application of the *Miller* factors, is inherently at odds with such a sentence

28

under accepted rationales for punishing members of society. Under Montana law, offenders are sentenced in order to inflict punishment proportionate with the crime, protect the public, restore victims, and encourage rehabilitation and reintegration of the offender into society. Section 46-18-101(2), MCA. As a juvenile offender, Keefe has "diminished culpability," *Montgomery*, 136 S. Ct. at 733, rendering the severest punishments disproportionate. Dr. Page indicated that Keefe has matured while incarcerated in a way that is consistent with a successful response to rehabilitation efforts and that Keefe could be released with relatively low risk to society. Whether his sentence was imposed for the purposes of punishment, the protection of society, or rehabilitation,[2] Keefe has served his time and these ends have been reached. The denial of parole eligibility to a youthful offender such as Keefe serves no further legitimate penological purpose.

¶54 I recognize there are many situations where young people, by virtue of the crimes they commit and other pertinent circumstances, should be treated by the court system as adults. Our juvenile courts are not adequate for all cases, including the present one. However, *Miller* and *Montgomery*—as well as the Montana Constitution's special protection for juveniles—require that the analysis does not end there but, instead, recognize the special constitutional status of adolescents. The courts have recognized that status as it relates to the development of young people under the age of majority for many years. *See, e.g.*, *In re Gault*, 387 U.S. 1, 87 S. Ct. 1428 (1967). It is time to recognize that our Constitution has granted even greater protections in this regard.

---

[2] Sadly, not even a sentence of life without parole can restore the victims of this horrific crime.

¶55 This Court has, prior to the *Miller* decision, ordered a district court, on remand, to strike a 60-year parole restriction for a crime committed by a juvenile. *State v. Olivares-Costar*, 2011 MT 196, 361 Mont. 380, 259 P.3d 760. I agree with the majority to remand this case to the District Court. While I would strike the "without parole" provision of the sentence, given the necessity of providing the District Court with a majority Opinion, I acknowledge that the District Court has discretion to conduct a new hearing.

/S/ MIKE McGRATH

Justice Dirk Sandefur specially concurring in part and dissenting in part.

¶56 I concur with the Court's holdings that, in reviewing Keefe's life sentence without parole for compliance with the Eighth Amendment to the United States Constitution, the District Court did not erroneously fail, in light of the manifest absence of a sufficient showing of resulting prejudice, to appoint an expert to unilaterally assist him in lieu of an independent expert report to the court, and that Keefe had no constitutional right to have a jury determine the ultimate constitutional question of whether he is irreparably corrupt and incorrigible. I further concur that the District Court erroneously failed to consider evidence of Keefe's post-sentencing rehabilitation under the unique procedural circumstances of this case and, based on that evidentiary error, with the Court's ultimate reversal of the District Court's reimposition of a life sentence without possibility of parole.

¶57 I would squarely hold, as the Majority essentially does, that *Miller* and *Montgomery* effectively established an Eighth Amendment presumption that life in prison without possibility of parole is cruel and unusual punishment, as applied to juvenile offenders, absent an affirmative evidentiary showing by the state, and corresponding finding by the sentencing court, that the juvenile offender is irreparably corrupt and incorrigible. I also concur with the special concurrence of Chief Justice McGrath, and would so further hold, that the cited provisions of the Montana Constitution effect a similar Montana constitutional presumption regarding juvenile offenders, independent of the United States Constitution.

¶58 I would thus more specifically hold that, regardless of the evidentiary error noted by the Majority, the State failed to meet its burden, on the extraordinary Eighth Amendment review warranted in this particular case, of presenting sufficient evidence to affirmatively overcome the Eighth Amendment and independent Montana constitutional presumptions that life in prison without possibility of parole is cruel and unusual punishment of a juvenile offender. I would therefore ultimately hold that the District Court erroneously reimposed an unconstitutional life sentence without possibility of parole on a juvenile offender. However, rather than remanding for resentencing, I would merely remand for entry of an amended judgment striking and excluding the offending parole eligibility restriction.

¶59 A sentence or sentencing provision that contravenes a constitutional right or exceeds, or does not comply with, a governing statutory authorization or limitation is illegal. *See State v. Olivares-Coster*, 2011 MT 196, ¶¶ 18-22, 361 Mont. 380, 259 P.3d

31

760; *State v. Garrymore*, 2006 MT 245, ¶¶ 149-50, 334 Mont. 1, 145 P.3d 946.[1] If an illegal sentence or sentencing provision is correctable other than by merely striking the illegal portion of the sentence, then the proper remedy for correcting the illegality is remand for resentencing. *State v. Heafner*, 2010 MT 87, ¶ 11, 356 Mont. 128, 231 P.3d 1087. However, if correctable by striking the illegality from the original sentence without affecting the balance of the sentence, the proper remedy is reversal and remand with instruction for entry of an amended judgment striking and excluding the illegality. *Heafner*, ¶¶ 11-12.

¶60 In *Heafner*, upon sentencing the defendant to concurrent prison terms for accountability to aggravated burglary, accountability to aggravated assault, and witness tampering, the district court illegally imposed various conditions of supervision in the event of parole. *Heafner*, ¶¶ 3 and 6. Rejecting the State's assertion that remand for resentencing was the proper remedy, we reversed and remanded for entry of an amended judgment striking and excluding the illegal parole conditions. *Heafner*, ¶¶ 8 and 11-13.[2] *See also State v. Lehrkamp*, 2017 MT 203, ¶¶ 37-41, 388 Mont. 295, 400 P.3d 697 (reversing and remanding for an amended judgment striking parole conditions not included in the oral pronouncement of judgment).

---

[1] *But see State v. Beaudet*, 2014 MT 152, ¶ 17, 375 Mont. 295, 326 P.3d 1101 (distinguishing between illegal and merely objectionable sentences and sentencing provisions for purposes of contemporaneous object/waiver rule and procedural *Lenihan* rule). *Accord Garrymore*, ¶ 90.

[2] We also separately reversed a non-specific restitution award and remanded for reconsideration and imposition of a definite amount of restitution. *Heafner*, ¶¶ 12-13.

¶61 In *State v. Petersen*, 2011 MT 22, 359 Mont. 200, 247 P.3d 731, upon imposing a base 100-year sentence for deliberate homicide, the district court erroneously imposed an additional 10-year statutory weapons enhancement in disregard of the statutory prerequisite that the State include the weapons enhancement in the charging Information. *Petersen*, ¶¶ 1, 4, and 13. Pursuant to *Heafner*, we reversed and remanded for entry of an amended judgment striking the illegal weapons enhancement, thereby preserving the base 100-year sentence originally imposed. *Petersen*, ¶ 16. As in *Heafner*, we held that remand for resentencing was not the proper remedy because striking the illegal sentencing provision was the only way to correct the illegality. *Petersen*, ¶ 16.

¶62 Similarly in *Olivares-Coster*, upon sentencing a seventeen-year-old defendant to two consecutive life sentences for deliberate homicide and attempted deliberate homicide (two concurrent counts), we held that the district court erroneously restricted his parole eligibility pursuant to an otherwise applicable mandatory parole restriction statute, but without consideration of a separate statutory exception for offenders less than eighteen-years-old. *Olivares-Coster*, ¶¶ 11-14 and 20. Concluding that the most straightforward way to correct the erroneous portion of the sentence was to simply strike the offending parole restriction, we reversed and remanded for entry of an amended judgment to that end. *Olivares-Coster*, ¶¶ 20 and 22 (by analogy to *Heafner* and *Peterson*). In rejecting the State and dissent assertion that the appropriate remedy was remand for resentencing and consideration of whether a *discretionary* parole restriction might yet be appropriate, we held that remand for resentencing "would be futile" because the record clearly indicated that the district court had already "explicitly declined" to otherwise

consider a discretionary parole restriction in its oral pronouncement of sentence. *Olivares-Coster*, ¶¶ 19-20.[3]

¶63 Here, on postconviction review over thirty years after the fact, the District Court correctly concluded pursuant to *Miller* and *Montgomery* that Keefe's original 1987 sentence (3 consecutive life sentences without parole for deliberate homicide, a consecutive 10-year sentence for burglary, and 4 consecutive 10-year weapons enhancements (40 years)) was unconstitutional in violation of the Eighth Amendment prohibition against cruel and unusual punishment. The court thus vacated the original sentence for resentencing for due consideration as to whether Keefe is in fact irreparably corrupt and incorrigible for Eighth Amendment purposes. The State did not subsequently challenge that determination.

¶64 However, on resentencing, the District Court rejected and ignored unrebutted testimony of the independent court-appointed forensic psychologist and former Warden of the Montana State Prison regarding Keefe's maturation and demonstrated amenability to rehabilitation and community supervision. The court thus reimposed the original sentence without material change on the same grounds originally considered and imposed. Whether on the Majority's cited ground for reversal, or a more straight-forward recognition that the

---

[3] *Accord Vernon Kills on Top v. Guyer*, No. OP 18-0656, 2019 WL 3451280, *2 and *5 (Mont. July 30, 2019) (reversing and remanding for entry of an amended judgment striking double jeopardy based illegal sentence (aggravated kidnapping LWOP) but preserving the balance of the original sentence (deliberate homicide-life sentence with no parole restriction)), *reh'g denied*, *Vernon Kills on Top v. Guyer*, No. OP 18-0656, 2019 WL 5057500, *3 (Mont. Oct. 8, 2019) (denying State petition for rehearing seeking remand for resentencing on both offenses).

State failed to meets its evidentiary burden of providing irreparable corruption and incorrigibility on Eighth Amendment review, the sentence reimposed by the District Court on resentencing in 2019 is just as illegal as the same sentence it previously found illegal in violation of the Eighth Amendment.

¶65 As in *Olivares-Coster*, *Peterson,* and *Heafner*, Keefe's illegal sentence is now constitutionally correctable only by striking his parole restriction, thus not affecting the balance of his base sentence and thereby merely affording him an *opportunity* for parole in the ordinary course of Montana law.[4] As in *Olivares-Coster,* remand for yet a *third* sentencing is unnecessary and futile because the District Court has already had an opportunity to correct the fundamental *Miller-Montgomery* error in this case and emphatically declined to do so upon intentional disregard of unrebutted evidence manifestly fatal to overcoming the determinative constitutional presumptions. Irrespective of its patently erroneous conclusion that *favorable* evidence of Keefe's post-offense development, maturation, and conduct was not relevant to whether he is irreparably corrupt

---

[4] As correctly noted by the original sentencing judge (Hon. Thomas McKittrick) in 1987, Keefe's crimes were among the most heinous, senseless, and irreparably harmful to the victims and their family as any conceivable. As with the infamous Charles Manson murders in California, the Montana Parole Board may never see fit to grant Keefe parole, even if eligible. But that is not the constitutional point. The constitutional point of *Miller* and *Montgomery* is that even an incomprehensibly heinous juvenile offender should at least have the *opportunity* for parole, whether ultimately successful or not, absent affirmative *proof beyond the mere heinous facts of the crime* that the juvenile offender is in fact irreparably corrupt and incorrigible. *See also Roper v. Simmons*, 543 U.S. 551, 569-71, 125 S. Ct. 1183, 1195-96 (2005) (noting significant differences between juvenile and adult offenders in heinous crimes for purposes of Eighth Amendment cruel and unusual punishment); *Steilman v. Michael*, 2017 MT 310, ¶¶ 26-33, 389 Mont. 512, 407 P.2d 313 (Wheat, J., dissenting) (discussing implications of *Miller* and *Montgomery* and remand for striking of offending juvenile offender parole restriction as proper remedy).

and incorrigible, the District Court arbitrarily discredited and dismissed the unrebutted contrary evidence unambiguously on the merits, without any record justification or basis for discrediting its veracity, credibility, or weight. Under these peculiar circumstances, remand for yet another resentencing will futilely accomplish nothing more than unnecessarily prolonging the inevitable on the manifestly static evidentiary record, thereby unnecessarily causing further emotional distress to the victims' family, inflammation of public sentiment, delay, and public expense. The State does not assert that it will have any new evidence to bring to bear and has made no showing of any reason why yet another resentencing over 30 years after the fact is necessary to correct this constitutional error in any manner other than by striking and excluding Keefe's parole restriction. I therefore dissent from the Court's remand for resentencing and would instead simply remand for entry of an amended judgment striking and excluding the restrictions on Keefe's parole eligibility.

/S/ DIRK M. SANDEFUR

Justice Laurie McKinnon, concurring and dissenting.

¶66 I join the Court's opinion on Issues One and Three; I dissent from the Court's resolution of Issue Two and conclude that Keefe received an individualized resentencing where "youth and its attendant characteristics" was considered as constitutionally required. After Keefe's resentencing for a triple homicide, and considering all of Keefe's "features" of youth, I conclude that the sentence imposed was not disproportionate under the Eighth Amendment.

36

¶67    This case concerns the scope of the rule enunciated in *Miller* and declared retroactive in *Montgomery*.  More particularly, it asks what procedures a state must afford a postconvicition petitioner in a *Miller-Montgomery* resentencing hearing in order to comply with the substantive rule established in *Miller* that renders life without parole disproportionate for the vast majority of juveniles given their "diminished culpability and heightened capacity for change . . . ."  *Miller*, 567 U.S. at 479.  Under *Miller*, only those juveniles whose crimes reflect "permanent incorrigibility" are constitutionally eligible for life without parole.  *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 726.  *Miller* and *Montgomery* establish that the Eighth Amendment requires a sentencing court consider the circumstances and attendant characteristics of youth before imposing a sentence of life without parole on a juvenile homicide offender. *Miller* and *Montgomery* each dealt with mandatory sentencing schemes that left the sentencing court with no discretion but to indiscriminately sentence all offenders to life without parole.  *Miller* reasoned that by making youth irrelevant, as it is in a mandatory sentencing scheme, there is "too great a risk of disproportionate punishment."  *Miller*, 567 U.S. at 479.  *Miller* relied on cases holding the Eighth Amendment "categorically" forbids certain punishments for a class of offenders or type of crime.  *Miller*, 567 U.S. at 470.  For example, the death penalty may not be imposed for crimes other than murder, and it may not be imposed on those who are intellectually disabled or those under the age of eighteen.  *Miller*, 567 U.S. at 470. *Miller* also relied on cases prohibiting the mandatory imposition of capital punishment and which required instead that "sentencing authorities . . . consider the characteristics of a defendant and the details of his offense before sentencing him to death."

37

*Miller*, 567 U.S. at 470. *Miller* drew on its precedent and concluded that juveniles are "constitutionally different" for sentencing purposes, just as death is constitutionally different. *Miller*, 567 U.S. at 481. Sentencers, therefore, must have the opportunity to consider the "mitigating" circumstances of youth before imposing the harshest sentence a youth can receive (life without parole), just as mitigating circumstances are considered in adult capital punishment cases. *Miller*, 567 U.S. at 489.

¶68 *Miller* established that a sentence of life without parole is disproportionate for all juveniles, except those juveniles whose crimes reflect "irreparable corruption." *Miller*, 567 U.S. at 479-80. *Miller* requires that the sentencing be individualized so the sentencer can assess and decide which class of juveniles the offender is in: those juveniles who cannot be subjected to life without parole because their crimes reflect "transient immaturity," or the rare juvenile who can be constitutionally sentenced to life without parole because their crimes reflect irreparable corruption. *Miller*, 567 U.S. at 479-80. *Miller* did not ban life without parole for all juvenile murderers, only those rare juveniles whose crimes reflect permanent incorrigibility. The task at resentencing is for the sentencing court to decide in which group the juvenile offender belongs, guided by factors identified in *Miller*. In neither *Miller* nor *Montgomery* did the Court mandate the procedure state courts are to follow to ensure that only "permanently incorrigible" youth are sentenced to life without parole; instead, the Court allowed states, under principles of federalism, to "develop[ ] appropriate ways to enforce" the process of distinguishing between the two classes of offenders. *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 735. However, the *Montgomery* Court warned that adherence to principles of federalism "should not be

38

construed to demean the substantive character of the federal right at issue." *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 735.

¶69    As *Miller* addressed a mandatory sentencing scheme, the *Miller* Court listed several non-exhaustive "hallmark features" of youth that sentencing courts are *precluded* from considering under *mandatory* sentencing schemes. Those features include:

> 1.    "immaturity, impetuosity, and failure to appreciate risks and consequences";
> 2.    "the family and home environment that surrounds . . .from which [a juvenile] cannot usually extricate himself—no matter how brutal or dysfunctional";
> 3.    "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him" or whether "he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth"; and
> 4.    "the possibility of rehabilitation."

*Miller*, 567 U.S. at 477-78. Conversely, state courts conducting *Miller-Montgomery* resentencing hearings have applied these "hallmark features" of youth as *factors to consider* at resentencing. *Miller*, itself, did not require a sentencing court to consider or assess any one feature of youth over another, or make one feature more important than others. *Miller* does not require any one particular feature of youth to predominate over others; rather, very simply, a sentencing court "misses too much if [it] treats every child as an adult." *Miller*, 567 U.S. at 477. Here, after accurately explaining the implications of *Roper*, *Miller*, *Montgomery*, and *Stielman*, to Keefe's resentencing, the District Court considered, and addressed in its written order, each feature of youth. I turn to those features now.

39

¶70    The District Court found that, at the time of the offense, Keefe was criminally sophisticated; developmentally mature; and assertive of his independence, indeed living on his own. Keefe had already committed 50 offenses as a juvenile and was well-versed in the criminal justice system. The record supports the District Court's findings, and Keefe admitted, that he rehearsed his criminal activities before executing them. He knew the consequences of his actions and chose to disregard them. The psychological evaluations conducted for Keefe's original sentencing and his postconviction resentencing supported the District Court's findings that Keefe did not act impulsively; that he exhibited considerable self-control and calculation; and that Keefe committed his crimes with full knowledge of what would result, but simply did not care.

¶71    The District Court next considered Keefe's childhood, family, and home environment. After considering challenges Keefe faced as a youth, the District Court concluded there was no evidence of "significant developmental experiences, traumatic events, or other life-changing situations that would mitigate the heinously violent crimes that he committed." Regarding any peer or family influences impacting Keefe, Dr. Page explained that "[i]t does not appear that Mr. Keefe experienced abnormally strong, negative, or chronic influences that would have had an anomalous impact on his decision making . . . [and] most, if not all, of [Keefe's] negative experiences occurred as a result of his own behaviors."

¶72    The District Court next considered the circumstances of the triple homicide. After first noting Keefe's chronological age at the time of the offense being 88 days short of his eighteenth birthday, the District Court explained that Keefe had "murdered three innocent

people in cold blood"; that "[h]e did it mercilessly and without hesitation or remorse"; and that he did not stop with one victim, but killed three times. First, Keefe shot Dr. McKay in the back of the head as he was preparing to set out glasses for a family gathering; next, Keefe shot Dr. McKay's daughter, Dr. Marian McKay Qumar, twice as she attempted to flee—once in the back and again in the ankle; and finally, Keefe shot Dr. McKay's wife, Constance, in the back as she lay over her dying daughter. Keefe committed these murders alone and without an accomplice. He acted deliberately and with premeditation. He was sober during the homicides. The District Court found the nature of the crimes particularly abhorrent because Keefe "did not stop with one victim. He killed, he killed, and he killed." Finally, given the circumstances of the offense, Keefe would not be entitled to a lesser offense than deliberate homicide.

¶73 Regarding Keefe's prospects for rehabilitation, reports filed in preparation for the original sentencing indicate Keefe had an anti-social personality disorder, extensive criminal history, and had failed in every treatment facility he was placed. The PSI recommended a sentence of life without parole. At the resentencing hearing, the District Court allowed Keefe to present evidence of prison rehabilitative efforts, but concluded that even if it were proper to consider Keefe's rehabilitative efforts in prison, Keefe's lack of remorse, ideations through tattoos, and changing stories of his offense, demonstrated his claims of rehabilitation were not credible. Keefe tattooed his body with three skulls, the grim reaper, and the phrase "guilty until proven innocent." These tattoos were not present when Keefe was originally sentenced. Dr. Page concluded these permanent markings speak to Keefe's pride in the murders he committed and his belief he

41

was treated unfairly. The District Court interpreted the tattoos as "evidence of Keefe's bravado about [the] killings and his total lack of genuine remorse." The District Court found that Keefe's recent claims of being only an accomplice to a now-deceased person demonstrate that Keefe has not accepted responsibility for his crimes and is not committed to rehabilitation.

¶74 Based on the foregoing evidence and findings, the District Court specifically found that Keefe was one of those juveniles whose "crimes [did] not represent transient immaturity, but rather they represent irreparable corruption and permanent incorrigibility as defined by the United States Supreme Court."

¶75 This Court concludes that the District Court disregarded evidence of Keefe's rehabilitation and did not fully consider relevant evidence. Although the District Court addressed and considered the relevant factors of youth, this Court bases its conclusion on the District Court's discussion of whether postconviction evidence of rehabilitation was relevant to Keefe's *Miller-Montgomery* resentencing. Evidence of *postconviction* rehabilitation, even if it is relevant, is only an *aspect* of *one* feature ("the possibility of rehabilitation") of youth. Here, the District Court considered the prospects of rehabilitation at the time of Keefe's original sentencing and at his resentencing, in addition to all the other factors of youth. Regardless, and in spite of its initial reluctance, the District Court allowed evidence of Keefe's postconviction rehabilitation, appointed an independent expert to examine Keefe, ordered an updated PSI, and allowed Keefe to present any and all witnesses he wanted. The District Court, therefore, considered Keefe's potential for rehabilitation in light of all the other evidence produced and relevant to the other "features" of youth. The

District Court was "unmoved" by Keefe's evidence of postconviction rehabilitation in prison, determined it not to be credible, and concluded Keefe has not "accept[ed] full responsibility for his crime." Through its discussion of each of the "hallmark features" of youth, the District Court demonstrated it understood the requirements of *Miller* and *Montgomery*, and of Montana law. The District Court assessed the presented evidence relevant to *all* the factors of youth and concluded that Keefe's "crimes do not represent transient immaturity, but rather they represent irreparable corruption and permanent incorrigibility as defined by the United States Supreme Court." This Court has pointed to no error in the District Court's findings; Keefe received a resentencing hearing where factors of youth were considered; and Keefe's resentencing complied with *Miller*, *Montgomery*, and Montana law. A remand to consider additional evidence on an aspect of one factor that the District Court found not credible is misguided.

¶76 In my opinion, Keefe received a resentencing hearing that considered the "hallmark features" of youth, as set forth in *Miller* and *Montgomery*, and adopted by this Court. He now contends that the District Court reached the wrong result in resentencing him to life without parole and faults the District Court for not weighing more heavily the purported evidence of his rehabilitation. Indeed, Keefe was an adult who has been incarcerated for decades when he was resentenced. Taking advantage of this lapse in time, Keefe asks this Court to consider his experience in the years since his crime. We should be mindful that Keefe's request for relief comes in the form of a petition for postconviction relief. The postconviction court asks the same questions as the original court. While an argument can be made that a sentencing court is not constitutionally required to assess

Keefe's subsequent experience in prison, the District Court nevertheless considered this evidence. The District Court did not find Keefe's evidence of rehabilitation credible and found overwhelmingly that consideration of the other features weighed heavily against Keefe. Here, Keefe received exactly what the Eighth Amendment requires: an individualized sentencing where the sentencing judge considered youth and its attendant characteristics before imposing a sentence of life without parole. The District Court specifically addressed the requirements of *Miller* and *Montgomery* and concluded that Keefe fit into the small and rare class of offenders whose crimes reflect "irreparable corruption," and not "transient immaturity." I cannot find a legally supportable basis upon which to substitute what I might have done at sentencing for that of the District Court.

¶77 I would affirm the District Court's sentence and deny Keefe's request for a third resentencing. I dissent.

/S/ LAURIE McKINNON

Justice Jim Rice joins in the Concurrence and Dissent of Justice McKinnon.

/S/ JIM RICE