FILED

07/13/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0199

DA 19-0199

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 176

IN THE MATTER OF

S.G.-H.M., JR.,

    A Youth.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DJ 06-07
Honorable Jeffrey H. Langton, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Chad Wright, Appellate Defender, Kristen L. Peterson, Assistant Appellate
Defender, Helena, Montana

    For Appellee:

        Austin Knudsen, Montana Attorney General, Andrew J. Cziok, Assistant
Attorney General, Helena, Montana

        William E. Fulbright, Ravalli County Attorney, Hamilton, Montana

Submitted on Briefs:  May 5, 2021

Decided:  July 13, 2021

Filed:

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1  S.G.-H.M. challenges an October 10, 2018 order denying his motion to dismiss for lack of jurisdiction.  We reverse.

¶2  We restate the issue on appeal as follows:

> *Whether a court retains jurisdiction over a youth court proceeding after the youth reaches the age of 25 if the court does not transfer jurisdiction pursuant to § 41-5-1605(3), MCA.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3  S.G.-H.M. was born in June 1990.  In 2006, When S.G.-H.M. was 16 years old, his mother found a gallon container of acetone, a small container labeled as sodium nitrate, a bottle labeled "napalm," and binders containing handwritten instructions for making various explosives in S.G.-H.M.'s room.  The State filed a petition in youth court to proceed under the Extended Jurisdiction Prosecution Act (EJPA), charging S.G.-H.M. with possession of explosives, in violation of § 45-8-335(1)(a), MCA, and criminal endangerment, in violation of § 45-5-207, MCA.  S.G.-H.M. admitted to these charges.  A presentence investigation (PSI) concluded that S.G.-H.M. was a "potentially volatile young man" but was believed to have "excellent potential if a treatment package can be put together to meet his multiple and pressing needs" to allow him to "grow up healthy and happy and not be a threat to the community."  On November 22, 2006, the Judge held a dispositional hearing and subsequently found S.G.-H.M. to be a serious juvenile offender and delinquent youth under § 41-5-103, MCA.  Pursuant to statute, S.G.-H.M. received a juvenile disposition consisting of both a juvenile sentence and an adult sentence.  The juvenile sentence consisted of formal probation until he reached the age of 23 (a period

2

consisting of approximately six and a half years), subject to 28 conditions. The adult sentence consisted of a six-year deferred imposition of sentence on each charge, to run concurrently, subject to 29 conditions. The court also ordered, pursuant to § 41-5-1604, MCA, that the execution of the adult sentence was stayed on the condition that S.G.-H.M. not violate the provisions of his juvenile disposition and not commit a new offense.

¶4 Less than three months before S.G.-H.M.'s juvenile probation was set to expire in 2013, the State filed a petition to revoke, alleging various violations of the conditions of S.G.-H.M.'s sentence. On July 10, 2013, S.G.-H.M., now age 23, admitted to having been cited for possession of alcohol and vagrancy in 2010 and to failing to provide documentation of completion of a chemical dependency assessment and a substance abuse program. The Judge "implemented the adult sentence in a modified form," imposing two three-year deferred sentences to run concurrently, subject to the same conditions as those imposed upon the original stayed adult sentences in 2006. At a hearing, the Judge inquired whether "this will be under the supervision of Adult Probation and Parole," to which the parties agreed. The record does not show any court order transferring the matter from Youth Court to District Court or any discussion regarding jurisdiction over S.G.-H.M.

¶5 A few months later, the State filed a second petition to revoke. S.G.-H.M. admitted to violations of conditions of his sentence—that he had tested positive for methamphetamine, had been in possession of alcohol, had attempted to purchase illegal drugs, and had given false identification to law enforcement. On January 29, 2014, the Judge revoked S.G.-H.M.'s deferred adult sentences, and sentenced S.G.-H.M. to five years Department of Corrections (DOC) custody with two years suspended, upon the

3

previous conditions. The court denied any "probation time credit." The judgment set forth that "supervisory responsibility for [S.G-H.M.] remains transferred from Juvenile Probation Services to the Montana Department of Corrections, Adult Probation and Parole Bureau."

¶6 S.G.-H.M. turned 25 in 2015, while serving the custodial portion of the 2014 sentence. In October 2017, while S.G-H.M. was serving the probationary portion of the 2014 sentence, the State filed a third petition to revoke, alleging that S.G.-H.M. had missed an appointment with his parole officer, failed to respond to a contact letter, failed to keep his home address updated, and left his place of employment without returning. S.G.-H.M. was 27 years old. S.G.-H.M. filed a motion to dismiss for lack of jurisdiction, arguing that the Youth Court's jurisdiction over him ended when he reached the age of 25 and that, since the Judge had not "transfer[red] the case to the district court" under § 41-5-1605(3), MCA, there was no longer a tribunal with jurisdiction over his case. The Judge denied the motion, reasoning that jurisdiction had transferred from Youth Court to District Court automatically at the execution of S.G.-H.M.'s adult sentence in 2013. The case proceeded to a revocation hearing and the court entered a judgment revoking the suspended portion of S.G.-H.M.'s sentence. The judgment did not grant credit for street time. S.G.-H.M. appeals.

**STANDARD OF REVIEW**

¶7 This Court reviews a decision to grant or deny a motion to dismiss for lack of subject matter jurisdiction for correctness. *Comm'r of Political Practices for Mont. v. Bannan*, 2015 MT 220, ¶ 7, 380 Mont. 194, 354 P.3d 601. We review criminal sentences for

4

legality, a question of law subject to de novo review. *State v. Heath*, 2004 MT 126, ¶ 13, 321 Mont. 280, 90 P.3d 426; *State v. McCaslin*, 2011 MT 221, ¶ 6, 362 Mont. 47, 260 P.3d 403. This Court reviews matters of statutory interpretation for correctness. *State v. Felde*, 2021 MT 1, ¶ 8, 402 Mont. 391, 478 P.3d 825.

## DISCUSSION

¶8 *Issue: Whether a court retains jurisdiction over a youth court proceeding after the youth reaches the age of 25 if the court does not transfer jurisdiction pursuant to § 41-5-1605(3), MCA.*

¶9 On appeal, S.G.-H.M. renews his argument that no court had the necessary jurisdiction to sentence him for matters stemming from his 2006 Youth Court proceeding after he reached the age of 25 in 2015, contending that the Judge failed to transfer the case to District Court. The EJPA constitutes Part 16 of the Montana Youth Court Act (Youth Court Act) and allows youth courts to address cases involving youths "alleged to have committed an offense that would be a felony if committed by an adult." Section 41-5-1602, MCA. The EJPA provides for a youth court disposition in such cases consisting of a juvenile disposition and an adult sentence that is "stayed on the condition that the youth not violate the provisions of the disposition order and not commit a new offense." Section 41-5-1604(1)(a), MCA.

¶10 Pursuant to the EJPA, a youth court's jurisdiction terminates when an individual reaches the age of 25. Section 41-5-205(3), MCA. However, jurisdiction may be transferred from a youth court to a district court upon revocation of the stay of the adult sentence. Section 41-5-1605(3), MCA, provides: "Upon revocation and disposition under subsection (2)(b)(iii), the youth court shall transfer the case to the district court." Thus, if

5

S.G.-H.M.'s proceeding was "transfer[red] . . . to the district court" at the 2013 revocation, court jurisdiction over his case could continue beyond the statutory 25-year age limit.

¶11 Section 41-5-1605, MCA, does not define "transfer." There is nothing in the record demonstrating that the Judge ordered the case be transferred from Youth Court to District Court. The State argues that jurisdiction transferred automatically in 2013 when the Judge lifted the stay on S.G.-H.M.'s 2006 adult sentence. The State notes that the same judge presided over both the Youth Court and the District Court and argues that the failure to transfer jurisdiction from himself, as a youth court judge, to himself, as a district court judge, represents a mere "formal defec[t]" that this court should "loo[k] past."

¶12 We are not tasked with commenting upon the wisdom of this provision of the EJPA. In statutory interpretation, "the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. The statutory text clearly provides that the transfer of jurisdiction must be accomplished by the revoking court, stating that, upon revocation, "the *youth court shall transfer* the case to the district court." Section 41-5-1605(3), MCA (emphasis added). The EJPA could have, but does not, provide that, upon revocation "the case *is transferred* to the district court." The statutory text does not provide for a self-executing transfer but, instead, unambiguously requires a youth court judge to affirmatively act to move the case to a district court. Whatever act is entailed by the statutory use of the term "transfer," it must be something more than nothing.

¶13 The State contends that the Judge implicitly transferred jurisdiction under § 41-5-1605(3), MCA, by specifying at the revocation hearing that supervision would be

6

with "Adult Probation and Parole" rather than juvenile probation services. Section 41-5-1605, MCA, provides that: "*Upon transfer*, . . . youth court jurisdiction is terminated. Ongoing supervision of the offender is with the department, rather than the youth court's juvenile probation services." (Emphasis added.) The statute does not suggest that the act of designating supervision can substitute for the required "transfer"; it simply describes the consequences of that transfer. Even assuming a court could transfer jurisdiction without a formal order, jurisdiction is "the court's fundamental authority to hear and adjudicate cases or proceedings," *In re A.D.B.*, 2013 MT 167, ¶ 54, 370 Mont. 422, 305 P.3d 739, and we will not find jurisdiction on the basis of such meager implications.

¶14 Relatedly, the State argues that the Judge "manifestly presided over S.G.-H.M.'s case as the district court" by imposing an un-stayed adult sentence in January of 2014—an action beyond the purview of a youth court under § 41-5-1604(1)(a), MCA. Much like designating department supervision, this simply demonstrates that the Judge *acted like* a district court to whom jurisdiction had been transferred. Behaving as if jurisdiction exists does not establish that a proper jurisdictional transfer occurred any more than driving a vehicle establishes that the one has acquired a driver's license. The State points to no evidence that the Judge issued any order, made any pronouncement, or took any action that could be interpreted as fulfilling the statutory requirement that he "transfer the case to the district court." Section 41-5-1605(3), MCA.

¶15 Because a youth court's jurisdiction under the EJPA terminates when the youth reaches the age of 25 and the Judge did not transfer jurisdiction to a district court, there

7

was no tribunal with jurisdiction over S.G.-H.M.'s case after he turned 25 in 2015. The Judge had no authority to hear the 2017 revocation proceedings brought against 27-year-old S.G.-H.M. and erred in declining to dismiss the case. The subsequent sentence is therefore illegal.

¶16 This conclusion is bolstered by our understanding of the purposes of the Youth Court Act. The Youth Court Act embodies "Montana['s] recogni[tion] that youths are to be given special treatment by the courts." *In re Cascade Cty. Dist. Court*, 2009 MT 355, ¶ 14, 353 Mont. 194, 219 P.3d 1255. In this way, Montana aligns itself with the "collective thrust of [United States] Supreme Court jurisprudence . . . recogni[zing] that juveniles are 'constitutionally different from adults'" for purposes of sentencing. *State v. Keefe*, 2021 MT 8, ¶ 13, 403 Mont. 1, 478 P.3d 830 (quoting *Montgomery v. Louisiana*, 577 U.S. __, 136 S. Ct. 718, 736 (2016)).

¶17 More specifically, the Youth Court Act "promote[s] individual rehabilitation and allow[s] young people to learn positive lessons from their transgressions." *In re Cascade Cty. Dist. Court*, ¶ 14. The express legislative purposes of the Youth Court Act include providing for the "mental and physical development" of youths, efforts to "reduce youth delinquency through a system that does not seek retribution," providing services "for youth *before* they become adult offenders," and "separating the youth from the parents only when necessary for the welfare of the youth or for the safety and protection of the community." Section 41-5-102, MCA (emphasis added).

¶18 These stated purposes reflect several key underpinnings. First is the moral judgment that troublesome youths have "diminished culpability," undercutting the justification for

8

retributive responses and instead demanding care for their welfare. *See Montgomery*, 577 U.S. at __, 136 S. Ct. at 733 (quotation omitted); § 41-5-102, MCA (creating a "system that does not seek retribution" and allowing for the separation of a youth from parents "only when necessary for the welfare of the youth" or community safety). Second is the empirical assessment that youths have "greater prospects for reform" than their adult counterparts, a prognosis that buoys hope of avoiding unnecessary entanglement with the criminal justice system in adulthood. *See Montgomery*, 577 U.S. at __, 136 S. Ct. at 733 (quotation omitted); § 41-5-102, MCA (providing for the "mental and physical development" of youths and services "for youth *before* they become adult offenders" (emphasis added)).

¶19    Finally, the Youth Court Act vindicates society's heightened interest in enabling members of the younger generation "to reach their full potential," as described by 1972 Constitutional Convention Delegate Monroe while sponsoring Article II, Section 15, of the Montana Constitution, which specifically protects the rights of persons under 18 years of age. *See Keefe*, ¶ 47 (McGrath, C.J., concurring in part and dissenting in part) (quoting Montana Constitutional Convention, Verbatim Transcript, March 8, 1972, Vol. V, p. 1750). For instance, the Youth Court Act requires that the relevant records be sealed upon the youth's eighteenth birthday, allowing the young person to enter adult society with a clean slate rather than forever branded by the contact with the justice system and dogged by the debilitative effects of a record. Section 41-5-216, MCA; *see also* § 41-5-221, MCA (providing criminal sanctions for any person who improperly discloses confidential youth court records).

¶20 Essentially, the Youth Court Act provides appropriate responses to youthful misdeeds more reflective of "transient immaturity" than "irreparable corruption," without unnecessary embroilment with a punitive system that will tarnish the youth's lifetime potential. *See Montgomery*, 577 U.S. at __, 136 S. Ct. at 734 (describing as "rare" the juvenile offender whose misdeed reflects "permanent incorrigibility" or "irreparable corruption" rather than an "unfortunate yet transient immaturity" (citations omitted)).

¶21 By all appearances, S.G.-H.M. was exactly the sort of youth envisioned by the Youth Court Act. The nature of his offense is indicative of "transient immaturity" and the State points to nothing in the record suggesting that S.G.-H.M.'s youthful interest in explosives has accompanied him into adulthood. The 2006 PSI determined that S.G.-H.M. had "excellent potential" and could, if given the proper tools, be expected to "grow up healthy and happy and not be a threat to his community." We therefore find it difficult to reconcile our understanding of the purpose of the Youth Court Act with the fact that S.G.-H.M., at the age of 27, was still under supervision and facing criminal proceedings stemming from this event.

¶22 S.G.-H.M. appears to have become entrapped in an endless cycle of supervision and conditions imposed as penalties for violations of prior conditions. Since 2006, S.G.-H.M. has been subject to dozens of various conditions ranging from keeping "his parent(s) informed of his whereabouts and activities at all times" and "abid[ing] by the rules of his home" to forfeiting his privacy rights, paying a myriad of fees and costs, observing curfews and restrictions on residence and travel, abstaining from alcohol and drugs, completing various counseling programs, reporting to his probation officer, seeking and maintaining

10

employment, obtaining permission "before financing or purchasing a vehicle, property, or engaging in business," and complying with all "city, county, state, federal laws, ordinances," while "conduct[ing] himself as a good citizen." Though the State apparently did not view any of S.G.-H.M.'s alleged missteps in the intervening years as rising to a level warranting criminal prosecution, the predictable result of this approach has been multiple DOC commitments and a treadmill of State supervision with no foreseeable endpoint. *See Maddox v. State*, 246 A.3d 604, 615-16 (Md. Ct. Spec. App. 2021) ("By imposing additional conditions on a probationer, creating numerous opportunities for a probationer to violate probation, the probationer could be trapped in a permanent probation period and facing a minefield of conditions."); *Rodriguez v. Providence Cmty. Corr., Inc.*, 155 F. Supp. 3d 758, 764 (M.D. Tenn. 2015) (enjoining probation practices that had "trap[ped] probationers in a pernicious cycle for years on end"); Cecelia Klingele, *Criminal Law: Rethinking the Use of Community Supervision*, 103 J. Crim. L. & Criminology 1015, 1035 (2013) ("While often reasonable when considered individually, in the aggregate, the sheer number of requirements imposes a nearly impossible burden on many offenders."); Lara Montecalvo et al., *Article: No Exit, No End: Probation in Rhode Island*, 21 Roger Williams U. L. Rev. 316, 350 n. 130 (describing a "vicious cycle" of technical probation violations leading to incarceration resulting in a loss of employment or housing, leading to more violations).

¶23 The Youth Court Act envisions that one day, the youth will no longer be a youth, the court's involvement will come to an end, and the individual will independently embark

upon adult life, seeking his or her full potential. *See* § 41-5-205(1), (3), MCA (terminating youth court jurisdiction at ages 21 or 25).[1]

## CONCLUSION

¶24 We conclude that the Youth Court lost jurisdiction over S.G.-H.M. when he reached his 25th birthday and the case was not transferred to a district court. As such, after S.G.-H.M. reached the age of 25, no court had jurisdiction over proceedings stemming from his involvement with the Youth Court commencing in 2006. The lower court therefore erred in declining to dismiss the case for lack of jurisdiction and subsequently imposed an illegal sentence.

¶25 The lower court's order is reversed, and the sentence is vacated.

/S/ MIKE McGRATH

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR
/S/ BETH BAKER
/S/ INGRID GUSTAFSON

---

[1] Because we agree with S.G.-H.M. that the lower court did not have jurisdiction over him after he reached the age of 25 pursuant to § 41-5-1605(3), MCA, we need not address his remaining arguments regarding credit for time served and street time credit.