FILED

05/20/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0363

DA 22-0363

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 107

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

JOSEPH EDWARD KNOWLES,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. ADC-16-534
Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Tammy A. Hinderman, Appellate Defender Division Administrator,
Kristina L. Neal, Assistant Appellate Defender, Helena, Montana

      For Appellee:

            Austin Knudsen, Montana Attorney General, Brad Fjeldheim,
Assistant Attorney General, Helena, Montana

            Joshua A. Racki, Cascade County Attorney, Great Falls, Montana

Submitted on Briefs:  January 30, 2025

Decided:  May 20, 2025

Filed:

_____
Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1 Defendant and Appellant Joseph Edward Knowles appeals from the May 19, 2022 Order Denying Motion for Sentence Reduction issued by the Eighth Judicial District Court, Cascade County.

¶2 We address the following restated issue on appeal:

*Whether the District Court abused its discretion by reimposing Knowles's original adult sentence following a Criminally Convicted Youth Act sentence review hearing which occurred after the Act was not followed for over four years after Knowles's original sentence.*

¶3 We reverse and remand for application of the Criminally Convicted Youth Act provisions prior to a CCYA sentence review hearing should Knowles request one within two years of the date of this Opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 On the night of September 23, 2016, Knowles, then 16 years old, and his 18-year-old girlfriend, Brianna Coombs, made a plan to steal marijuana from Megan Meriwether, also 18, in Great Falls. Knowles and Coombs, along with Westin and Corey Piner, met up with Meriwether in an alley under the pretense of buying drugs from her. Coombs grabbed the bag of marijuana and ran away. Meriwether chased Coombs back to the car where Knowles had remained with the Piners. Coombs and Meriwether got into a fight over the drugs, during which Meriwether pulled a knife on Coombs. Knowles got out of the car while the two were fighting and joined the fight to assist Coombs. Coombs was able to take the knife from Meriwether while Knowles interceded. Ultimately, Knowles ended up with the knife and stabbed Meriwether in the neck. Knowles and Coombs got back into

2

the car with the knife and a bag of marijuana and drove away. Meriwether died from the knife wound.

¶5    On October 3, 2016, the State exercised its discretion under § 41-5-206(1), MCA, to charge Knowles as an adult with deliberate homicide, tampering with or fabricating physical evidence, and accountability to robbery. After Knowles moved to substitute the presiding district court judge and all Cascade County district court judges declined to take the case, Missoula County district court judge John Larson accepted jurisdiction. Following a § 41-5-206(3), MCA, transfer hearing, the District Court denied a transfer of the case to Youth Court. The State filed an amended information on March 31, 2017, charging Knowles with deliberate homicide pursuant to the felony murder rule under § 45-5-102(1)(b), MCA, and tampering with or fabricating physical evidence under § 45-7-207, MCA.

¶6    On October 3, 2017, pursuant to a plea agreement providing for the dismissal of the tampering with evidence charge, Knowles pled guilty to the deliberate homicide of Meriwether as charged in the amended information. The plea agreement called for the State to recommend a 60-year sentence at the Montana State Prison (MSP) with no restriction on parole eligibility, while Knowles was free to argue for any legal sentence. At the December 19, 2017 sentencing hearing, Knowles argued for a 60-year MSP commitment, with 30 years suspended. During the sentencing hearing, Knowles also presented the testimony of Dr. Theresa Reed, an expert in juvenile development who conducted an examination of Knowles. Dr. Reed testified that Knowles belonged to the

3

adolescent class of offenders, which are "less mature, less culpable, and [have] a greater potential for rehabilitation than an adult offender class." Dr. Reed concluded Knowles should not receive the same sentence as an adult offender would, but should nevertheless receive severe consequences for the deliberate homicide. The District Court orally imposed a 60-year sentence to MSP. The court also told Knowles he would "have a chance to take advantage of lots of situations in the prison, lots of educational opportunities, lots of vocational opportunities, lots of counseling opportunities" before becoming parole-eligible. The District Court issued its written judgment, reflecting the 60-year MSP commitment, on December 28, 2017. The court's judgment did not reflect that Knowles was a criminally convicted youth under the Criminally Convicted Youth Act (CCYA), § 41-5-2501, MCA, et seq., or contain any of the relevant provisions applicable to Knowles as a criminally convicted youth under the Act.

¶7 Knowles appealed his original judgment to this Court. The appeal was ultimately dismissed after the parties reached a stipulation regarding an amended judgment which would add statutory provisions related to Knowles being a criminally convicted youth under the CCYA. Over six years ago, on April 2, 2019, this Court issued an Order in accordance with the parties' stipulation which dismissed the appeal and ordered the "matter be remanded to the District Court with instructions to amend the written judgment to reflect the District Court's continuing jurisdiction over Mr. Knowles until age 21; that the Department of Corrections submit status reports every 6 months to the District Court until Mr. Knowles reaches the age of 21; that the District Court review Mr. Knowles's sentence

4

prior to turning age 21 pursuant to the CCYA; and that Mr. Knowles [will] have the right to counsel at his CCYA sentence review hearing." *State v. Knowles*, No. DA 18-0105, Order (Mont. Apr. 2, 2019). This Court's Order directed the Clerk of the Supreme Court "to provide copies of this Order to all counsel of record and to the Clerk of Court for Cascade County. Additionally, the Clerk of the District Court is to send a certified copy of the amended judgment to the Records Department of the Department of Corrections (DOC)."

¶8 Despite the Cascade County Clerk of Court filing a copy of this Court's Order in Knowles's file on April 3, 2019, nothing happened in the case for over two years.[1] Knowles filed an unopposed Motion for the Court to Follow Supreme Court Instructions and Set Status Hearing on December 21, 2021. The District Court issued an Order for Department of Corrections Status Report on Defendant and Order Setting Status Hearing on December 28, 2021, and an Order Amending Judgment on December 29, 2021. In both orders, the court noted it had not been provided notice of this Court's April 2, 2019 order and was unaware of it until receiving an emailed copy attached to Knowles's December 21, 2021 motion.[2] The District Court's Amended Judgment included the relevant language from our April 2, 2019 Order—that the District Court had continuing jurisdiction over

---

[1] According to the District Court's register of actions, a Notice of Appointment of Counsel was apparently filed on September 21, 2021, though this document does not appear in the record transmitted to this Court.

[2] As previously noted, Judge Larson, presiding over the case after every district court judge in Cascade County was either substituted or declined to assume jurisdiction, has his chambers in Missoula.

Knowles until he turned 21; that DOC was required to submit status reports every six months until Knowles turned 21; that the court was to review Knowles's sentence prior to him turning 21; and that Knowles had the right to counsel at his CCYA sentence review hearing. By the time the District Court issued the Amended Judgment, Knowles had already turned 22 and the DOC had not filed a single status report regarding his rehabilitative progress while in prison.

¶9 The DOC filed its first and only status report on January 21, 2022, over four years after Knowles became a criminally convicted youth. The status report listed nine disciplinary violations Knowles had accrued during his approximately five years in prison. The DOC's status report noted Knowles was "compliant with treatment" and was currently on the wait list for recommended treatment. The report recommended no sentence reduction at this time. The District Court held a status hearing on January 27, 2022, during which the parties discussed setting a CCYA sentence review hearing even though Knowles was now 22 years old and the possibility of the need for a writ of supervisory control. Both Knowles and the State agreed simply setting the sentence review hearing was the best course of action and no writ was filed. The court ultimately set a sentence review hearing for April 5, 2022. Prior to the sentence review hearing, the DOC submitted an updated PSI.

¶10 At the April 5, 2022 sentence review hearing, the District Court heard testimony from Probation and Parole Officer Tim Hides, the author of both the original and the updated PSIs; Donna Nelson, Meriwether's mother; Cierra Sizemore, Knowles's case

6

manager at the Crossroads Correctional Center; and Cheyenne Knowles, Knowles's sister. PO Hides, who did not interview Knowles as part of the updated PSI, testified regarding Knowles's write-ups during his time in prison and to Knowles being on waiting lists for Batterer's Intervention, Thinking for Change, and CDITU classes. PO Hides further testified that he had not seen and had no interactions with Knowles since he was originally sentenced in 2017. PO Hides testified that he had not been supervising Knowles since the sentencing because "[n]obody supervises them in the prison" and had not been managing Knowles's case because "prisons have their own case managers." PO Hides also testified that he had not reviewed the status report because he was not provided with a copy and "did not know that even existed." Nelson testified that she wished for Knowles to serve "every day" of his original sentence, but that she hoped he would get the opportunity for rehabilitation because Knowles will "have a lot of life to live after he gets out[.]" Sizemore testified that Knowles was in a high security "close custody" setting because of the length of his sentence and disciplinary write-ups he had received while in prison; that it was hard for Knowles to get a job due to his high-side placement; to Knowles's position on the waitlist for classes being due to the length of his sentence but that he could move up on the waitlist if he were parole eligible sooner; that Knowles had received his HiSET while in custody; and that Knowles had access to classes on his tablet and she assumed he had completed at least some tablet classes because "[m]ost of the guys in there have done, at least, some of the programming on there." Sizemore stated she thought Knowles, if given the opportunity, "would do a good job at rehabilitating. I've never had a problem with him

7

in the unit as far as I'm concerned. So, given the opportunity, I think he would take it." On cross-examination by the State, Sizemore testified she had talked to Knowles about taking classes and not getting write-ups as a way to get out of the high security classification. The District Court asked Sizemore to supplement her testimony after the hearing with information as to what tablet classes Knowles had taken and completed. Cheyenne Knowles testified that it would be beneficial for Knowles to get into programs as soon as possible because the family was concerned he would become institutionalized as he first entered the system at 16 years old and was not on track to enter prison programming until he was around 30. At the close of the hearing, the District Court requested each party brief their position after receiving the information from Crossroads regarding Knowles's tablet classes records.

¶11 After the hearing, Crossroads provided a transcript of Knowles's tablet classes. The transcript showed Knowles had done 9.46 total hours of coursework in total and completed one class entitled Eric the Car Guy – Noises on February 11, 2021. The transcript reflected that Knowles had spent 6.05 hours on the course he completed, and 3.41 total hours on various other courses up to April 10, 2022. The State filed its post-hearing brief on May 6, 2022, asserting Knowles failed to meet his burden of demonstrating substantial rehabilitation and was not entitled to a sentence reduction. The State acknowledged Knowles was on the waiting list for programming due to the length of his sentence, but argued Knowles did not avail himself of services available to him and did not seek out any "education or correspondence classes," nor had he "engaged in mental health services."

8

Knowles filed his post-hearing brief on May 10, 2022, asserting he had been substantially rehabilitated "for the services that have been provided to him." Knowles asserted he had "not been afforded meaningful opportunities for rehabilitation, so it is impossible for him to comply with the intent of the [c]ourt . . . because the Montana Department of Corrections has made that impossible under the current circumstances of offering no programming or employment[.]" Knowles requested the District Court reduce his original 60-year MSP commitment to a 60-year MSP sentence, with 20 years suspended, so as to move him up the waiting list and get him into programming sooner.

¶12 On May 19, 2022, the District Court issued its Order Denying Motion for Sentence Reduction. The court found Knowles had not been substantially rehabilitated and was not entitled to a sentence reduction as he had "failed to engage in any significant rehabilitative programming on his own initiative" and had "disciplinary violations and failed to meaningfully engage in any self-help program."

¶13 Knowles appeals. Additional facts will be discussed as necessary below.

**STANDARD OF REVIEW**

¶14 We review criminal sentences for legality. *State v. Souther*, 2022 MT 203, ¶ 6, 410 Mont. 330, 519 P.3d 1 (citing *State v. Seals*, 2007 MT 71, ¶ 7, 336 Mont. 416, 156 P.3d 15). We review a district court's discretionary decisions for abuse of discretion. *State v. Colvin*, 2016 MT 129, ¶ 10, 383 Mont. 474, 372 P.3d 471 (citing *State v. Breeding*, 2008 MT 162, ¶ 10, 343 Mont. 323, 184 P.3d 313). A district court abuses its discretion when it acts arbitrarily, without conscientious judgment or in excess of the bounds of

reason resulting in substantial injustice. *State v. Walla*, 2025 MT 42, ¶ 7, 421 Mont. 11, 564 P.3d 850.

**DISCUSSION**

¶15 *Whether the District Court abused its discretion by reimposing Knowles's original adult sentence following a Criminally Convicted Youth Act sentence review hearing which occurred after the Act was not followed for over four years after Knowles's original sentence.*

¶16 On appeal, Knowles presents a substantive due process claim, asserting DOC made it impossible for him to demonstrate substantial rehabilitation by the time of the sentence review hearing by placing him on waiting lists to get into rehabilitative programming at the prison based on the length of his sentence. Knowles contends the District Court failing to reduce his sentence was an abuse of discretion due to this due process violation. The State asserts Knowles waived his due process argument by not raising it below. The State further contends that, if this Court chooses to address the issue, Knowles did not have his constitutional right to due process violated. Upon our review of the record, we determine it is unnecessary to reach the constitutional issue as presented by the parties here because the repeated violations of the CCYA in this case mandate reversal and a remand for the application of CCYA provisions prior to a sentence review hearing.

¶17 Generally, we will not address arguments not raised or supported by the parties themselves. *State v. Andersen-Conway*, 2007 MT 281, ¶ 14, 339 Mont. 439, 171 P.3d 678. But we are not foreclosed from addressing a dispositive issue simply because the parties did not raise it in the manner the Court determines is proper after our review of the record. *Andersen-Conway*, ¶ 14; *see also State v. Ellsworth*, 2023 MT 8, ¶ 12, 411 Mont. 213,

10

523 P.3d 527 (reversing a district court's revocation sentence because the original deferred sentence expired prior to the State's revocation petition based on a calculation of time which was not raised or argued by the parties). This Court has held that a serious error which appears on the face of the record is reviewable, even if not presented by the parties, if ignoring the error would cause substantial injustice. *Andersen-Conway*, ¶ 14 (citing *Kudrna v. Comet Corp.*, 175 Mont. 29, 51, 572 P.2d 183, 195 (1977)). "Where resort to the record is necessary, the case will be determined by the record, and in such a case the court will not regard itself as bound down to the conceptions of counsel on either side as to the nature of the controlling facts." *Kudrna*, 175 Mont. at 51, 572 P.2d at 195 (quoting *Cleveland, Cincinnati, Chicago & St. Louis Ry. Co. v. Moore*, 84 N.E. 540, 540 (Ind. 1908)).

¶18 Our authority to review the CCYA violations present in this case, even though Knowles framed the issue as a constitutional one, finds further support in our long-held practice to "avoid[] constitutional issues whenever possible." *State v. Normandy*, 2008 MT 437, ¶ 19, 347 Mont. 505, 198 P.3d 834 (citing *Sunburst Sch. Dist. No. 2 v. Texaco, Inc.*, 2007 MT 183, ¶ 62, 338 Mont. 259, 165 P.3d 1079). The CCYA, and this Court's April 2, 2019 Order requiring the District Court to amend its judgment and apply the CCYA provisions to Knowles's adult sentence prior to a sentence review hearing at which Knowles would be entitled to counsel, clearly set forth the responsibilities of both the District Court and the DOC. Those affirmative statutory mandates (as well as the explicit mandate of this Court following a stipulated dismissal of Knowles's appeal) were not

followed in this case. Because they were not followed, "we are able to decide this case without reaching constitutional issues." *Normandy*, ¶ 19.

¶19    Turning to the facts of the present case, let us begin with the statute. Montana enacted the CCYA in 1999 via Senate Bill 54. 1999 Mont. Laws ch. 532, §§ 17-20. Senate Bill 54 was introduced at the request of the Montana Department of Corrections by Senator Mike Halligan. Representatives of the DOC, the Montana Juvenile Probation Officers Association, and the Board of Crime Control appeared before the Senate Judiciary Committee in support of the bill. Specific to the provisions of the bill creating the CCYA, Matt Robinson on behalf of the DOC noted the bill addresses how juveniles convicted in adult court "should be treated by the justice system" by having the DOC "provide reports to the court so that the court can track these juveniles." *Senate Judiciary Committee Hearing Minutes in re SB 54* at 13 (Jan. 6, 1999). Robinson informed the committee that "[i]nformation and progress reports are provided every six months" and noted the bill's provisions conform to "Montana's Constitution which contains the unique provisions that allow for more protection for juveniles." *Senate Judiciary Committee Hearing Minutes in re SB 54* at 13 (Jan. 6, 1999). In enacting the CCYA, the Legislature set forth its purpose as follows:

> The criminally convicted youth act must be interpreted and construed to effectuate the following express legislative purposes:
>
> (1) to protect the public;
>
> (2) to hold youth who commit offenses that may be filed directly in district court pursuant to 41-5-206 accountable for their actions;

(3) to provide for the custody, assessment, care, supervision, treatment, education, rehabilitation, and work and skill development of youth convicted in district court; and

(4) to comply with the legislative purposes set forth in 41-5-102.

Section 41-5-2502, MCA. The CCYA "is a procedural mechanism comprised primarily of a sentencing provision applicable to youths convicted in the adult system, § 41-5-2503, MCA, and a sentence review provision available to them until they turn 21, § 41-5-2510, MCA." *State v. Mainwaring*, 2007 MT 14, ¶ 13, 335 Mont. 322, 151 P.3d 53. The Montana Youth Court Act, with whose legislative purposes the CCYA is to comply, set forth its purpose as follows:

> The Montana Youth Court Act must be interpreted and construed to effectuate the following express legislative purposes:
>
> (1) to preserve the unity and welfare of the family whenever possible and to provide for the care, protection, and wholesome mental and physical development of a youth coming within the provisions of the Montana Youth Court Act;
>
> (2) to prevent and reduce youth delinquency through a system that does not seek retribution but that provides:
>
> (a) immediate, consistent, enforceable, and avoidable consequences of youths' actions;
>
> (b) a program of supervision, care, rehabilitation, detention, competency development, and community protection for youth before they become adult offenders;
>
> (c) in appropriate cases, restitution as ordered by the youth court; and
>
> (d) that, whenever removal from the home is necessary, the youth is entitled to maintain ethnic, cultural, or religious heritage whenever appropriate;

(3) to achieve the purposes of subsections (1) and (2) in a family environment whenever possible, separating the youth from the parents only when necessary for the welfare of the youth or for the safety and protection of the community;

(4) to provide judicial procedures in which the parties are ensured a fair, accurate hearing and recognition and enforcement of their constitutional and statutory rights.

Section 41-5-102, MCA. This Court has found that the stated purposes of the Youth Court Act:

> reflect several key underpinnings. First is the moral judgment that troublesome youths have "diminished culpability," undercutting the justification for retributive responses and instead demanding care for their welfare. *See Montgomery* [*v. Louisiana*], 577 U.S. [190, 207], 136 S. Ct. [718, 733 (2016)] (quotation omitted); § 41-5-102, MCA (creating a "system that does not seek retribution" and allowing for the separation of a youth from parents "only when necessary for the welfare of the youth" or community safety). Second is the empirical assessment that youths have "greater prospects for reform" than their adult counterparts, a prognosis that buoys hope of avoiding unnecessary entanglement with the criminal justice system in adulthood. *See Montgomery*, 577 U.S. at [207], 136 S. Ct. at 733 (quotation omitted); § 41-5-102, MCA (providing for the "mental and physical development" of youths and services "for youth *before* they become adult offenders" (emphasis added)).

*In re S.G.-H.M.*, 2021 MT 176, ¶ 18, 404 Mont. 531, 490 P.3d 1248.

¶20 The Youth Court Act and CCYA, each containing heightened protections for juvenile offenders, are statutory recognitions in this state of the fact that "juveniles are 'constitutionally different from adults in their level of culpability,' and those differences must be considered by a sentencing court." *State v. Keefe*, 2021 MT 8, ¶ 13, 403 Mont. 1, 478 P.3d 830 (quoting *Montgomery*, 577 U.S. at 213, 136 S. Ct. at 736) (*Keefe II*). This is true because "juveniles have diminished culpability and greater prospects for reform[.]"

*Miller v. Alabama*, 567 U.S. 460, 471, 132 S. Ct. 2455, 2464 (2012). As *Montgomery* noted, the *Miller* Court explained three significant gaps between juveniles and adults:

> First, children have a "lack of maturity and an underdeveloped sense of responsibility," leading to recklessness, impulsivity, and heedless risk-taking. Second, children "are more vulnerable to negative influences and outside pressures," including from their family and peers; they have limited "control over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievable depravity."

*Montgomery*, 577 U.S. at 207, 136 S. Ct. at 733 (quoting *Miller*, 567 U.S. at 471, 132 S. Ct. at 2464). In sentencing a juvenile offender in this state, the CCYA "does not just shuffle a youth off to the adult offender system and forget about his age. The rehabilitative goals of both the Youth Court Act and the Criminally Convicted Youth Act follow the youth until he or she reaches the age of twenty-one and the [d]istrict [c]ourt makes an express determination whether to finally impose the full adult sentence." *State v. Talksabout*, 2017 MT 79, ¶ 37, 387 Mont. 166, 392 P.3d 574.

¶21　In this case, Knowles was 16 years old at the time of the offense, and 17 years old when the District Court sentenced him, as an adult, to a 60-year commitment to MSP. The District Court's original judgment, issued on December 28, 2017, failed to comply with the CCYA as it did not reflect that Knowles was a criminally convicted youth subject to the provisions of the CCYA and failed to incorporate those provisions. Pursuant to the CCYA:

> (1) The district court, in sentencing a youth adjudicated in district court pursuant to 41-5-206, shall:

(a) impose any sentence allowed by the statute that established the penalty for the offense of which the youth is convicted as if the youth were an adult and any conditions or restrictions allowed by statute;

(b) retain jurisdiction over the case until the criminally convicted youth reaches the age of 21;

(c) order the department to submit a status report to the court, county attorney, defense attorney, and juvenile probation officer every 6 months until the youth attains the age of 21. The report must include a recommendation from the department regarding the disposition of the criminally convicted youth.

(2) The district court shall review the criminally convicted youth's sentence pursuant to 41-5-2510 before the youth reaches the age of 21 if a hearing has not been requested under 41-5-2510.

Section 41-5-2503, MCA. The language of the statute is not discretionary when it comes to ordering DOC to submit status reports to the court, county attorney, defense attorney, and juvenile probation officer every six months until the youth offender turns 21 or in its requirement that a district court must review the youth's sentence prior to the youth offender turning 21. "Both 'shall' and 'must' are mandatory, rather than permissive." *State v. Kortan*, 2022 MT 204, ¶ 21, 410 Mont. 336, 518 P.3d 1283 (quoting *Montco v. Simonich*, 285 Mont. 280, 287, 947 P.2d 1047, 1051 (1997)). The CCYA expressly mandates a district court to order DOC to submit status reports regarding the criminally convicted youth every six months, including the department's recommendation "regarding the disposition" of the offender—in other words, DOC's opinion as to whether the youth has been rehabilitated and should possibly receive a sentence reduction. Presumably, the purpose of the status reports is to, at least in part, assist the youth in understanding what rehabilitation efforts or programs the youth should be participating in, assist the youth in

16

getting into those efforts and programs, and provide the youth feedback as to his success or lack thereof so that the youth has notice of deficiencies and the opportunity to address them prior to a review hearing. Presumably the reports, at least in part, also are to assist the DOC, the youth's probation officer, and the sentencing court in assuring the youth is provided opportunities for meaningful rehabilitation programs and services.

¶22 After the District Court's original judgment failed to follow the CCYA, Knowles appealed to this Court. Pursuant to a stipulation Knowles reached with the State in his initial appeal, we ordered a remand for the District Court to amend its judgment to incorporate and reflect the CCYA provisions on April 2, 2019. The Cascade County Clerk of District Court filed this Court's order in Knowles's file on April 3, 2019. This Court's order was apparently not received by the presiding judge until December of 2021, however, and the District Court's judgment was not amended until December 29, 2021. The DOC did not file status reports every six months for the several years while Knowles was in prison and under 21 years of age, filing only a single status report on January 21, 2022, which recommended that Knowles not receive a sentence reduction. Though Knowles had already turned 22 and the CCYA had not been followed for over four years after he was originally sentenced, the District Court held a CCYA sentence review hearing on April 5, 2022.

¶23 In conducting a CCYA sentence review hearing, a district court is tasked with determining whether the youth offender has been substantially rehabilitated:

> (3) The sentencing court shall review the department's records, formal youth court records, victim statements, and any other pertinent information.

17

(4) The sentencing court, after considering the criminal, social, psychological, and any other records of the youth; any evidence presented at the hearing; and any statements by the victim and by the parent or parents or guardian of the youth and any other advocates for the youth shall determine whether the criminally convicted youth has been substantially rehabilitated based upon a preponderance of the evidence.

Section 41-5-2510(3)-(4), MCA. A finding of substantial rehabilitation is the threshold inquiry of the hearing. If the youth has not been substantially rehabilitated, a district court has no discretion to modify its original sentence. "Once a valid sentence has been pronounced, the court imposing that sentence has no authority to modify or change it, except as provided by statute." *State v. Damon*, 2025 MT 12, ¶ 9, 420 Mont. 225, 562 P.3d 1061 (citing *State v. Megard*, 2006 MT 84, ¶ 17, 332 Mont. 27, 134 P.3d 90). If substantial rehabilitation is demonstrated, however, the district court has discretion to modify the original sentence:

In the event that the sentencing court determines that the youth has been substantially rehabilitated, the court shall determine whether to:

(a) suspend all or part of the remaining portion of the sentence, impose conditions and restrictions pursuant to 46-18-201, and place the youth on probation under the direction of the department, unless otherwise specified;

(b) impose all or part of the remaining sentence and make any additional recommendations to the department regarding the placement and treatment of the criminally convicted youth; or

(c) impose a combination of options allowed under subsections (5)(a) and (5)(b), not to exceed the total sentence remaining.

Section 41-5-2510(5), MCA.

¶24 Because the District Court did not follow the CCYA in its original judgment and then failed to amend the judgment following this Court's order,[3] Knowles did not receive any of the benefit ongoing status reports may have provided to him prior to a review hearing. Likewise, the District Court did not have the benefit of ongoing status reports as contemplated by the CCYA prior to making its determination of whether Knowles had been substantially rehabilitated—it had access to only one belated status report which recommended no sentence reduction issued by the DOC over four years after Knowles was originally sentenced. Further, the DOC and the youth's probation officer did not have the benefit of ongoing reports to assist them in making sure Knowles was provided opportunity to participate in appropriate rehabilitative programs and services. Nevertheless, the District Court determined, based on the record before it, that Knowles was not substantially rehabilitated and denied the motion for sentence reduction. As we have previously noted, the CCYA "does not just shuffle a youth off to the adult offender system and forget about his age. The rehabilitative goals of both the Youth Court Act and the Criminally Convicted Youth Act follow the youth until he or she reaches the age of twenty-one and the [d]istrict [c]ourt makes an express determination whether to finally impose the full adult sentence." *Talksabout*, ¶ 37. Here, the District Court making the express determination to impose the full adult sentence after Knowles, a criminally convicted youth, did not receive any of the rehabilitative benefits of the CCYA for over four years following his sentencing as an adult, was an abuse of discretion. "The occurrence of substantial injustice resulting from a court

---

[3] We recognize this was at no fault of the District Court but rather occurred through error in not transmitting this Court's order to the presiding District Court judge.

19

acting arbitrarily without employment of conscientious judgment or beyond the bounds of reason means that the court abused its discretion." *State v. Ragner*, 2022 MT 211, ¶ 14, 410 Mont. 361, 521 P.3d 29.

¶25 At age 17, Knowles was shuffled off to an adult offender system which did not just "forget about his age," *Talksabout*, ¶ 37, it forgot about him entirely. When Knowles was 19, this Court attempted to rectify the problem, ordering the District Court to amend its judgment and apply the CCYA provisions, but the order was apparently never provided to the District Court and Knowles turned 22 before the judgment was finally amended. While Knowles should have been provided opportunities to participate in meaningful rehabilitation programs and services and been receiving updates from the DOC every six months which would detail his progress, or lack thereof, towards rehabilitation until he turned 21, he instead received zero during the statutory time period. Those reports are statutorily required to go to not just the sentencing court, but to the prosecutor, defense attorney, and juvenile probation officer. Section 41-5-2503(1)(c), MCA. Knowles's probation officer received no status reports, which he "did not know . . . even existed" and performed no supervision of Knowles while incarcerated because "[n]obody supervises them in the prison," though the CCYA mandating the probation officer receive the status reports would indicate the juvenile probation officer could be working with a CCYA offender on the offender's rehabilitation while still in prison. Knowles did, on his own initiative, complete his HiSET while incarcerated.

¶26	Because of the length of his sentence and expected parole eligibility date, Knowles was also placed on a waitlist for DOC's rehabilitative programming at the prison and had not yet received a spot in his three classes— Batterer's Intervention, Thinking for Change, and CDITU. While we do not reach Knowles's constitutional argument related to the DOC's waitlist policy, we must address whether the DOC's waitlist policy is designed to meet the statutory expectation of the Youth Court Act and the CCYA. Both the Youth Court Act and the CCYA explicitly center on and promote the rehabilitation of youthful offenders. Sections 41-5-102, -2502 MCA. Research indicates the brain undergoes a fundamental reorganization during adolescence and into early adulthood (age 25), particularly in the frontal lobes, the area of the brain responsible for executive functions such as attention, task initiation, and self-regulation. Kerstin Konrad et al., *Brain Development During Adolescence: Neuroscientific Insights Into This Developmental Period*, Deutsches Ärzteblatt International, 110(25), 425-31 (2013), https://doi.org/10.3238/arztebl.2013.0425; Sara B. Johnson et al., *Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy*, Journal of Adolescent Health, 45(3), 216-21 (2009), https://doi.org/10.1016/j.jadohealth.2009.05.016. The reorganizational processes are associated with extreme cognitive and emotional changes that control thought and behavior and permit the youth to flexibly adapt to new and complex situational tasks. It also involves social-affective activities with increased empathy and ability to put oneself in another's shoes and significantly less engagement in risky behaviors, especially when with peers.

Johnson et al. at 216-21. While DOC's waitlist policy may make logical sense when applied to adult offenders—attempting to ensure access to rehabilitative classes prior to parole eligibility by basing admission to classes on the length of sentence remaining, rather than a simple first-in, first-out method can help prevent a situation where an offender would be parole eligible but for his failure to complete programming and his spot in the class is filled by an offender decades away from parole eligibility—juvenile offenders are constitutionally different than adults, which we recognize in the sentencing context. *Keefe II*, ¶ 13. As we have explained, the CCYA "does not just shuffle a youth off to the adult offender system and forget about his age. The rehabilitative goals of both the Youth Court Act and the Criminally Convicted Youth Act follow the youth" into the system. *Talksabout*, ¶ 37. To meet these rehabilitative goals—and the mandates and purposes of the Youth Court Act and CCYA—DOC should make rehabilitative services available to youthful offenders in the adult system without delay. Waitlisting such youthful offenders based on the length of their sentence when those offenders, whose brains have yet to fully develop, "have diminished culpability and greater prospects for reform," *Miller*, 567 U.S. at 471, 132 S. Ct at 2464, and a guaranteed review of their sentence by age 21 (a quasi-parole opportunity), frustrates the rehabilitative goals of the Youth Court Act and CCYA. A juvenile offender sentenced as an adult under these statutory schemes should be given priority for admission to rehabilitative programming due to their young age and high potential for substantial rehabilitation. To do otherwise by placing CCYA offenders on the

22

same waitlist as adult offenders would be to "shuffle a youth off to the adult offender system and forget about his age." *Talksabout*, ¶ 37.

¶27 Ultimately, Knowles was denied the rehabilitative provisions of the CCYA through no fault of his own. For over four years, he was treated as though he was just another adult offender, not as the criminally convicted youth he was, and did not receive the rehabilitative benefits expressly provided for by the CCYA and Youth Court Act. This Court attempted to rectify the issue approximately two years before Knowles turned 21. Unfortunately, because the order was not provided to the presiding judge at that time, Knowles's sentence remained without the CCYA provisions until after he turned 22. A criminally convicted youth being denied application of the beneficial and rehabilitative CCYA provisions is a substantial injustice and we determine the matter must be remanded to allow DOC and the District Court to apply the rehabilitative CCYA provisions to Knowles. It is expected that consistent with the purposes of the CCYA and the Youth Court Act that during this extended period Knowles will be provided meaningful opportunities at rehabilitative programs and services planned and monitored through DOC and his probation officer and the DOC will provide written reports to Knowles, his attorney, his probation officer, the county attorney, and the District Court every six months providing its rehabilitative recommendations and assessing his rehabilitative success. Should Knowles desire a CCYA sentence review hearing to be considered for a reduced sentence, he shall file a written request for such hearing within two years of the date of this Opinion. The District Court shall, upon the expiration of two years from the

23

date of this Opinion, review the criminally convicted youth's sentence consistent with the substantive requirements of § 41-5-2510, MCA.

## CONCLUSION

¶28 The District Court abused its discretion by making the express determination Knowles had not been substantially rehabilitated after Knowles did not receive the rehabilitative benefits of the CCYA for over four years following his original sentence, even though this Court ordered the District Court to amend its judgment and apply the CCYA when Knowles would still have had the benefits of the CCYA for nearly two years prior to turning 21. The matter must be remanded to allow DOC and the District Court to apply the rehabilitative CCYA provisions to Knowles.

¶29 Reversed and remanded.

/S/ INGRID GUSTAFSON

We Concur:

/S/ KATHERINE M BIDEGARAY
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ LAURIE McKINNON