FILED

05/12/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 25-0034

DA 25-0034

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2026 MT 101

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

GRANT GAGE LAMAN,

      Defendant and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. CDC-2023-81
Honorable Kathy Seeley, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Samuel L. Martin, III, Delli Bovi, Martin, & Reed, LLC, Helena, Montana

      For Appellee:

            Austin Knudsen, Montana Attorney General, Thad Tudor, Assistant Attorney General, Helena, Montana

            Kevin Downs, Lewis and Clark County Attorney, Ann Penner, Deputy County Attorney, Helena, Montana

                    Submitted on Briefs:  January 21, 2026

                           Decided:  May 12, 2026

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1    Grant Gage Laman (Laman) appeals from the October 20, 2023 Order entered in the First Judicial District Court, Lewis and Clark County, which retained the matter in the District Court rather than transferring the proceeding to Youth Court. We affirm.

¶2    We restate the issue on appeal as follows:

*Whether the District Court erred by maintaining the criminal proceeding in the District Court instead of transferring it to Youth Court.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3    This case involves allegations of multiple instances of sexual intercourse without consent (SIWOC) and sexual abuse of children involving four different victims, three of whom were too young to consent. The alleged offenses occurred between December 2020 and May 2022.

¶4    In June 2022, Officer Scott Finnicum responded to a report of evidence of sex-related crimes on a phone belonging to P.S. Officer Finnicum learned that the phone belonged to P.S. but had previously belonged to N.W. N.W.'s Instagram account, still accessible on P.S.'s phone, had received messages from several people, including Laman. The messages indicated that Laman, then age seventeen, was involved in a continuing sexual relationship with N.W., then age fourteen. Although N.W. may have initially misled Laman about her age, he nonetheless continued to engage in sexual acts with her after learning her actual age. P.S. also showed additional evidence on the phone suggesting that Laman had engaged in SIWOC with two victims, N.W. and L.L., age fourteen, in a group setting; may have engaged in SIWOC with another victim, E.K.; and that there were nude

2

images of the then fourteen-year-old victims on Instagram. This information prompted Officer Finnicum to coordinate contact with the parents of L.L., N.W., and E.K. and to arrange for forensic interviews with the victims.

¶5 E.K. recounted her brief relationship with Laman in an interview with Officer Finnicum and Detective Sean Schoenfelder. E.K. met Laman on Snapchat in October 2020 before meeting in person the following month. E.K. reported that the two had a sexual relationship until early January 2021. E.K. recounted that she was not comfortable having sex with Laman but that he "was persistent" and pressured her to engage in sexual intercourse with him on multiple occasions. She explained that Laman would take her clothing off while she was telling him to stop and on at least one occasion forcibly removed her clothing. E.K. described another incident that involved forced penile-anal intercourse and another incident which involved forced penile-oral intercourse. E.K. broke off the relationship with Laman in January 2021.

¶6 Paula Samms (Samms), a Licensed Clinical Professional Counselor for the Children's Advocacy Center, conducted a forensic interview with N.W. N.W. recounted meeting Laman at a public park with her friends, P.S., K.C., and R.S. in spring of 2022. The group of juveniles hung out at the park for a while before going to R.S.'s home. There, Laman placed blankets on the ground and asked for a "four-way" sexual encounter with the other minors. N.W. reported that Laman "took turns" engaging in sexual intercourse with her and K.C. N.W. had not had intercourse before this incident, and she reported that she was not ready for that to happen. N.W. explained that she initially told Laman that she was sixteen years old. Laman continued to engage in sexual conduct with her after learning

3

that she was fourteen, however, despite her not being of the age of consent. N.W. described another occasion in which Laman had intercourse with her and L.L. in a public restroom with K.C. present in the same room. In May 2022, when N.W. was fourteen and Laman was seventeen, Laman threatened to break up with her if she did not send a video of her engaging in sexual activities with L.L. She also explained that she was aware of the existence of an explicit video of her and Laman, although she had not seen it.

¶7 Samms conducted a forensic interview with L.L. who, despite initial hesitancy to speak, ultimately disclosed the following allegations. L.L., then fourteen years old, stated that Laman lied to her, saying he was fifteen years old. In reality, Laman was seventeen years old. She explained that she joined a group chat with Laman and "sent him pictures." She further recounted how Laman asked for nude pictures of her and video of her engaging in sexual activities with N.W., and that Laman became angry at N.W. when she did not comply with his demands. L.L. described the incident in the public restroom, stating that she was nervous and Laman told her it was "going to be okay" but that "he did that to me." She explained that she had never had sexual intercourse before and that it was painful.

¶8 In June 2022, Snapchat produced access to an account associated with Laman in response to a search warrant from Officer Finnicum. The account contained photos and videos depicting child sexual abuse, including a video of two juveniles engaged in sexual intercourse. Based on his observations of previous photographs of N.W., Officer Finnicum recognized N.W. in the video. At the time this video was recorded, N.W. was approximately fourteen years old and Laman was seventeen years old.

4

¶9     Samms conducted a forensic interview with K.C., who recalled Laman forcing her to have sexual intercourse the first time they met despite her verbally telling him no. She further disclosed that during the incident Laman choked her by grabbing her by the front of the throat and that she was scared during the incident because she did not know what he was doing. She reported that after the incident she experienced soreness, including her neck, and she also felt exhausted and depressed. At the time of this incident K.C. was thirteen years old and Laman was seventeen years old. K.C. also described the incident in the public restroom. She recounted that her friends asked her to join them in the restroom to have a conversation but found Laman was there. She did not want to be there but felt compelled to "sit there" while Laman engaged in sexual activities with her friends. K.C. also corroborated the existence of child sex abuse materials of N.W.

¶10    In February 2023, the State charged Laman by Information with six counts of SIWOC and two counts of sexual abuse of children, all felonies. Counts one through three referred to Laman's conduct toward E.K. Count four referred to Laman's conduct toward K.C. Counts five and eight referred to Laman's conduct towards L.L. Finally, counts six and seven referred to Laman's conduct toward N.W.

¶11    The District Court held a Transfer Hearing in September 2023 to determine whether to transfer the matter to Youth Court or retain the proceedings in the District Court. Dr. Heather Zaluski, a child and adolescent psychiatrist, testified on behalf of Laman that she did not believe Laman presented a danger to the community and that it would be in his best interests to be transferred to Youth Court. Dr. Zaluski based her opinion on a comprehensive psychiatric evaluation of Laman and a juvenile psychosexual evaluation of

5

Laman conducted by Dr. Bowman Smelko, a licensed psychologist and a State of Montana Approved Sex Offender Evaluator. Dr. Smelko's evaluation disclosed that Laman was highly mature for his age, had a significant sexual history, and that he resorted to increasingly abusive, humiliating, and painful sexual fantasies paired with strong feelings of shame and remorse for his actions. Dr. Smelko's evaluation supported a transfer to Youth Court and concluded that, although Laman has a moderate-high risk of recidivism, he was motivated to participate in sex offender treatment. A moderate-high risk is the second highest risk level for a juvenile sexual offender.

¶12 Juvenile Probation Officer Jonathan Flynn testified on behalf of the State. Officer Flynn explained the challenges in supervising an adult on juvenile probation because the program has very few sanctions that he can impose upon a noncompliant offender compared to an offender on adult probation. Officer Flynn also described prior difficulty in monitoring sex offenders with a higher risk level of recidivism and noted that Laman's risk level was one of the highest he had seen. Finally, Officer Flynn explained that although juvenile probation can offer Global Positioning System (GPS), drug, and alcohol monitoring, a person can only be on juvenile probation until the age of 21 and that sex offender treatment can take up to three years. Laman was almost 19 at the time of his Transfer Hearing.

¶13 The District Court considered the three statutory factors necessary for a transfer to Youth Court and concluded that although a transfer would be in Laman's best interest, the interests of community protection and the serious nature of the offenses tipped in favor of retaining the case in district court. The District Court reasoned that the interests of

6

community protection would not be served by a transfer to Youth Court given Laman's age, mental health challenges, moderate-high risk level, the number of alleged victims, and the lack of tools available to juvenile probation to manage violations. Regarding the serious nature of the offenses, the District Court considered the multiple counts of SIWOC and sexual abuse of children involving four victims over a one-and-a-half-year period, Laman's moderate-high risk of reoffending, that the allegations involved manipulation of the victims, and that Laman was highly intelligent and mature, and concluded that these facts warranted prosecution in the District Court. Finally, the District Court found that a transfer to Youth Court would be in Laman's best interests given the lack of a sex offender registration requirement, the opinions of mental health professionals who evaluated Laman, and that he was motivated to attend sex offender treatment.

¶14     In April 2024, Laman pled guilty to one count of SIWOC and one count of sexual abuse of children involving his conduct toward N.W. pursuant to a plea agreement with the State. The remaining counts were dismissed. The District Court sentenced Laman to the Department of Corrections for two concurrent 15-year terms, with ten years suspended. The sentence also requires Laman to register as a Level 1 Sexual Offender.

## STANDARD OF REVIEW

¶15     "We review a district court's decision as to whether a juvenile should be prosecuted in youth court or district court for an abuse of discretion." *State v. Johnson*, 2023 MT 167, ¶ 11, 413 Mont. 202, 534 P.3d 676. A court abuses its discretion when it acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason, which results in a substantial injustice. *Johnson*, ¶ 11; *State v. Talksabout*, 2017 MT 79, ¶ 8, 387

7

Mont. 166, 392 P.3d 574. Findings of fact which a district court relied upon in making its transfer decision are reviewed for clear error. *Johnson*, ¶ 11; *Talksabout*, ¶ 8. A finding of fact is clearly erroneous where it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or where our review of the record convinces this Court that the district court made a mistake. *Johnson*, ¶ 11; *Talksabout*, ¶ 8. This Court views the evidence in the light most favorable to the party which prevailed below when determining whether a district court's findings are supported by substantial credible evidence. *Johnson*, ¶ 11. Finally, we review a district court's conclusions of law for correctness. *Johnson*, ¶ 11 (citing *State v. Whiteman*, 2005 MT 15, ¶ 10, 325 Mont. 358, 106 P.3d 543).

## DISCUSSION

¶16  *Whether the District Court erred by maintaining the proceeding in the District Court instead of transferring it to Youth Court.*

¶17  A county attorney must seek leave of a district court to file an information if a juvenile defendant was 17 years old at the time of the offense and is alleged to have committed one of several enumerated offenses, including SIWOC. *Johnson*, ¶ 12 (citing § 41-5-206(2), MCA). Once a district court grants leave to file the information, "the district court shall conduct a hearing to determine whether the matter must be transferred back to the youth court," unless waived by the juvenile defendant. *Johnson*, ¶ 12 (quoting § 41-5-206(3), MCA). "The very essence of a transfer hearing involves a decision of whether a youth should be prosecuted as an adult." *Johnson*, ¶ 23. The district court may only transfer the matter to Youth Court if it finds, by a preponderance of the evidence, that:

8

> (a) a youth court proceeding and disposition will serve the interests of community protection;
>
> (b) the nature of the offense does not warrant prosecution in district court; and
>
> (c) it would be in the best interests of the youth if the matter was prosecuted in youth court.

*Johnson*, ¶ 12 (citing § 41-5-206(3), MCA). "Each of these factors must be met in order to transfer the case to youth court." *Johnson*, ¶ 12 (quoting *Talksabout*, ¶ 11). A district court is generally in the best position to weigh the evidence and resolve contravening evidence before it when analyzing these factors. *Johnson*, ¶ 12 (citing *State v. Dietsch*, 2013 MT 245, ¶ 16, 371, Mont. 460, 308 P.3d 111). Thus, this Court generally will not overturn a district court's resolution of conflicting evidence. *Talksabout*, ¶ 11.

¶18 When analyzing whether the nature of the offense warrants prosecution in district court, the court "must look to the nature of the allegations—and not just the *seriousness* of the offense." *Johnson*, ¶ 16 (quoting *Talksabout*, ¶ 20). Consistent with United States Supreme Court jurisprudence, this Court has held that "juveniles are 'constitutionally different from adults in their level of culpability[.]'" *Johnson*, ¶ 21 (quoting *State v. Keefe*, 2021 MT 8, ¶ 13, 403 Mont. 1, 478 P.3d 830, quoting *Montgomery v. Louisiana*, 577 U.S. 190, 213, 136 S. Ct. 718, 736 (2016)). Evidence of an offender's attributes, therefore, informs the nature of the offense inquiry. *Johnson*, ¶ 19 (citing *Dietsch*, ¶ 16). These attributes may include possible mitigating facts such as an "offender's youthfulness, social maturity, impulsivity, brain development, and other measures of maturity." *Johnson*, ¶ 23. Thus, evidence of a youth offender's attributes may inform whether the alleged conduct

"was the result of the predatory, deliberate, impulsive, situational, or negligent actions of the defendant." *Johnson*, ¶ 20. The allegations in *Johnson* involved a single, "impulsive act" of sexual abuse of an eleven-year-old girl during a very brief period. *Johnson*, ¶¶ 3-4.

¶19 On appeal, Laman asserts that the District Court failed to consider the factors discussed in *Talksabout*, namely the defendant's age, home environment, and conduct while on release. This Court, however, did not establish a set of necessary factors for courts to consider when addressing the interests of community protection in *Talksabout*, but, rather, merely discussed relevant facts the district court considered when making its determination. *Talksabout*, ¶ 14. Although these factors may often be relevant in Youth Court transfer cases, they do not constitute necessary findings that district courts must consider when determining whether to transfer a case to Youth Court. Laman further contends that the District Court abused its discretion by discarding the expert opinions of Dr. Smelko and Dr. Zaluski that the interests of community protection favored prosecution in Youth Court.

¶20 Here, the District Court likewise considered facts relevant to the interests of community protection. The District Court was in the best position to weigh the conflicting testimony of Dr. Zaluski and Probation Officer Flynn as well as Dr. Smelko's evaluation. The District Court noted that Dr. Zaluski does not perform sexual offender evaluations. The District Court properly considered Laman's then-current age, his moderate-high risk level for an adolescent, the number of alleged victims, and the serious concerns of Probation Officer Flynn in supervising an adult who is on juvenile probation when it found by a preponderance of the evidence that continuing the proceedings in the District Court

best served the interests of community protection. These facts are directly relevant when determining whether a transfer to Youth Court serves the interests of community protection. Transfer decisions must be made on a case-by-case basis depending on the relevant facts of each case.

¶21 Turning to the seriousness of the offense, Laman is alleged to have committed repeated acts of SIWOC and sexual abuse of children with four separate victims over approximately one and a half years. The nature of these allegations involves acts of force and coercion during multiple incidents with multiple victims. The deliberate and predatory nature of these offenses is demonstrated through Laman's emotional manipulation of N.W. and L.L. to obtain child sex abuse material involving the children. Likewise, Laman was "persistent" in his advances towards E.K. despite her discomfort engaging in sexual intercourse with him and, on at least one occasion, verbally asserting her nonconsent to intercourse. Laman additionally misrepresented his age to L.L. to entice her to engage in sexual conduct under the false pretense he was a more age-appropriate peer. Laman choked K.C. while forcing himself upon her. Unlike *Johnson*, the allegations here do not involve a single impulsive act but rather a pattern of sexual abuse involving multiple incidents, multiple victims, and multiple abuse scenarios over an extended period of time. The instant case stands in contrast to *Johnson*, which involved a socially immature juvenile with a low risk of reoffending who was alleged to have committed a single, impulsive act. *Johnson*, ¶ 25. The record here supports the District Court's findings that Laman possessed maturity; his alleged offenses involved deliberate emotional manipulation and/or physical coercion of multiple victims; and he had a moderate-high risk of reoffending.

11

¶22 Our review of the record demonstrates the District Court properly addressed the three statutory factors under § 41-5-206(3), MCA, and there was substantial credible evidence in support of its conclusions that the interests of community protection and the serious nature of the offenses warranted prosecution in a district court. Accordingly, the District Court did not abuse its discretion when it maintained the proceeding in the District Court rather than transferring the matter to Youth Court.

## CONCLUSION

¶23 The District Court properly applied the Youth Court transfer factors under § 41-5-206(3), MCA, and found by a preponderance of the evidence that the interests of community protection and the serious nature of the offenses warranted prosecution in district court.

¶24 Affirmed.

_____
/S/ LAURIE McKINNON

We Concur:

/S/ CORY J. SWANSON
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ JIM RICE